**CITY OF MORRIS, Respondent,**

v.

**SAX INVESTMENTS, INC., Appellant.**

No. A06–1188.

Supreme Court of Minnesota.

May 15, 2008.

J. Richard Stermer, Montevideo, MN, for Appellant.

Charles C. Glasrud, Morris, MN, George C. Hoff, Hoff, Barry & Kuderer, PA, Eden Prairie, MN, for Respondent.

Susan Lynn Naughton, St. Paul, MN, for League of Minnesota Cities Amicus.

**4**

Terry Lee Adkins, Patricia Kay Alfredson, Rochester, MN, for City if Rochester Amicus.

Gerald T. Hendrickson, St. Paul, MN, for City of St. Paul Amicus.

## OPINION

GILDEA, Justice.

In this case, we must determine whether the Minnesota State Building Code, Minn.Stat. §§ 16B.59–.75 (2006), permits the enforcement of four inspection standards contained in the Rental Licensing Ordinance of the City of Morris (Rental Licensing Ordinance), Morris, Minn., Rental Licensing Ordinance § 4.32 (2002). The district court concluded that the ordinance provisions regulate the business of rental housing, not the design or construction of buildings, and are therefore permitted under state law. The court of appeals affirmed, concluding that the ordinance provisions do not regulate "the act of building," but instead impose "standards of habitability" on "the subsequent use of the building as a business." *City of Morris v. Sax Invs., Inc.*, 730 N.W.2d 551, 556 (Minn.App.2007). We conclude that the ordinance provisions regulating ground fault interrupter receptacles, bathroom ventilation, and egress window covers are building code provisions that regulate a component or system of a residential structure and differ impermissibly from the State Building Code, and that these provisions are therefore prohibited by state law. But we conclude that the factual record is insufficient for us to determine whether the ordinance provision regulating smoke detectors in sleeping rooms is prohibited by state law. Accordingly, we reverse and remand to the district court.

The Rental Licensing Ordinance prohibits the use of residential property as rental property unless the property has been licensed by the City for such use. Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 3. Before a license is issued, the property must be inspected and found to "fully comply with all the provisions of the applicable rules, standards, statutes and ordinances which pertain to such dwelling units." *Id.*, subd. 6. Among the provisions that the property must satisfy before licensure are extensive inspection standards contained in the ordinance. *Id.*, subd. 21.

Appellant Michael Sax owns property in the City of Morris. On January 3, 2005, Sax registered the property as residential rental property. The record does not reveal whether the building on the property is a single-family or multi-family building. The parties agree, however, that no known improvements or alterations (other than replacement of shingles, siding, and exterior trim) have been made to the building since the State Building Code went into effect in 1972.

On January 18, 2005, an enforcement officer for the City of Morris inspected the property and identified eight violations of the inspection standards contained in the Rental Licensing Ordinance. The City ordered Sax to correct these violations. When the property was re-inspected two months later, four of the eight violations still had not been corrected: (1) ground fault interrupter receptacles were not installed on outlets within 6 feet of water sources in the kitchen, bathroom, and basement; (2) the bathroom did not contain either a window or a ventilation fan; (3) the egress windows in the basement lacked covers; and (4) the basement bedroom did not have a smoke detector. The City assessed a $50 fee due to the failed re-inspection.

After Sax refused to correct the remaining violations and pay the re-inspection fee, the City of Morris initiated the present action seeking temporary and permanent injunctions prohibiting Sax from leasing his property to residential tenants until the four remaining violations were corrected and the re-inspection fee was paid. In his answer to the City's complaint, Sax asserted that the remaining violations were not subject to a correction order because the property complies with the requirements of the Minnesota State Building Code. Sax also filed a counterclaim seeking an order directing the City to issue a residential rental license for the property and an injunction prohibiting the enforcement of the ordinance provisions.

The parties filed cross-motions for summary judgment. The district court ordered summary judgment in favor of the City on both the City's claim for a temporary injunction and Sax's counterclaims. The court concluded that the State Building Code does not prohibit local regulations that are "not directly tied to building design or construction," even if the subject of the local regulation "is also addressed in the State Building Code." Because it found that the ordinance provisions at issue in this case "are not structural, do not involve the 'design or construction' of the property, and do not involve complex 'components or systems' within [Sax's] rental property," the court concluded that the ordinance "regulates certain safety and health provisions that are part and parcel of the business of renting residential property in the City of Morris" and is therefore "a valid exercise of the City's police powers."

The court of appeals held that the State Building Code supersedes only local regulations pertaining "to construction, remodeling, alteration, or restoration, that is, to the act of building, and not to the subsequent use of the building as a business." *Sax Invs.*, 730 N.W.2d at 556. Accordingly, the court of appeals concluded that "[l]ocal authorities retain the right to regulate the business of rental housing by enacting standards of habitability." *Id.* Without defining "standards of habitability," and without analyzing whether the ordinance provisions at issue constitute "local building ordinances" or "standards of habitability," the court of appeals affirmed the district court. *Id.* We granted Sax's petition for further review.

■■■ On review of a "grant [of] summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *In re Estate of Kinney*, 733 N.W.2d 118, 122 (Minn.2007); *see also* Minn. R. Civ. P. 56.03. The application of statutes, administrative regulations, and local ordinances to undisputed facts is a legal conclusion and is reviewed de novo. *See Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998); *Wallin v. Letourneau*, 534 N.W.2d 712, 715 (Minn.1995); *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39 (Minn.1989).

I.

The questions presented in this case concern the scope of the Minnesota State Building Code. The State Building Code "governs the construction, reconstruction, alteration, and repair of buildings." Minn. Stat. § 16B.59. The purpose of the code is to "provide basic and uniform performance standards, establish reasonable safeguards for health, safety, welfare, comfort, and security of the residents of this state and provide for the use of modern methods, devices, materials, and techniques which will in part tend to lower construction costs." *Id.* To effectuate this legislative purpose, the statute instructs the Commis-

sioner of Administration to establish by administrative rule "a code of standards for the construction, reconstruction, alteration, and repair of buildings, governing matters of structural materials, design and construction, fire protection, health, sanitation, and safety." Minn.Stat. § 16B.61, subd. 1. Most of the substantive standards are addressed in these administrative rules, which encompass several separate chapters of Minnesota Rules. *See* Minn. R. 1300.0050 (2007) (listing the Minnesota State Building Code as including chapters 1300–70, 4715, and 7670–78).

Shortly after the State Building Code became effective in 1972, Act of May 26, 1971, ch. 561, § 4, 1971 Minn. Laws 1018, 1020, we considered the interaction between the State Building Code and municipal regulation in *City of Minnetonka v. Mark Z. Jones Assocs., Inc.,* 306 Minn. 217, 218–19, 236 N.W.2d 163, 165 (1975). In that case, a municipality sought to enforce a fire prevention ordinance that required the developer of an apartment complex to install an emergency lighting system in hallways and exits, and a sprinkler system in the basement garage. *Id.* at 218, 236 N.W.2d at 164–65. Although we recognized that municipalities were "undoubtedly" authorized to adopt some fire prevention ordinances, we held that the State Building Code preempts local ordinances that "affect [ ] the construction and design of buildings." *Id.* at 219–20, 236 N.W.2d at 165. In holding that the Minnetonka fire prevention ordinance provisions were preempted by state law, we concluded that "we are influenced, if not governed, by the fact that the State Building Code itself deals extensively with fire prevention and fire-related safety measures." *Id.* at 222, 236 N.W.2d at 167.

Since our decision in *Mark Z. Jones,* the legislature has added language to the State Building Code that specifically addresses municipal regulation of residential structures. Act of May 29, 2001, ch. 207, § 3, 2001 Minn. Laws 849, 850 (codified at Minn.Stat. § 16B.62, subd. 1). The specific issue here is whether the State Building Code, as currently written, leaves room for the enforcement of four inspection standards contained in the Rental Licensing Ordinance.

■ Generally, "municipalities have no inherent powers and possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred." *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 357, 143 N.W.2d 813, 820 (1966). Among other powers, statutory cities have the power to enact and enforce ordinances to promote "health, safety, order, convenience, and the general welfare." Minn.Stat. § 412.221, subd. 32 (2006).

■ Notwithstanding a city's broad "power to legislate in regard to municipal affairs," state law may limit the power of a city to act in a particular area. *Mangold,* 274 Minn. at 357, 143 N.W.2d at 819–20 (internal quotation omitted). For example, a city cannot enact a local regulation that conflicts with state law, and state law may "fully occupy a particular field of legislation so that there is no room for local regulation." *Id.* at 356, 143 N.W.2d at 819 (internal quotation omitted). In *Mangold,* we set forth four questions that are relevant in determining whether the area is one the legislature has "impliedly declared" to be an "area solely of state concern":

(1) What is the 'subject matter' which is to be regulated? (2) Has the subject matter been so fully covered by state law as to have become solely a matter of state concern? (3) Has the legislature in partially regulating the subject matter indicated that it is a matter solely of

state concern? (4) Is the subject matter itself of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state?

*Id.* at 358, 143 N.W.2d at 820. This analysis does not apply, however, when the legislature's intent to limit municipal regulation in a particular area is expressly stated in the language of the statute. *See id.* at 359, 143 N.W.2d at 821. When a statute contains specific language as to the extent of permissible municipal regulation, our focus is on the language of the statute. *See State v. Kuhlman,* 729 N.W.2d 577, 580 (Minn.2007) (applying the specific language of a state statute imposing a uniformity requirement on traffic regulations to determine the validity of a municipal ordinance authorizing photo enforcement of traffic control signals).

In this case, the relevant language of the State Building Code expresses the legislature's specific intent to supersede municipal building codes. In enacting a statewide building code, the legislature recognized that a single, uniform set of building standards was necessary to lower costs and make housing more affordable. *See* Act of May 26, 1971, ch. 561, § 1, 1971 Minn. Laws 1018, 1019 (noting that multiple laws, ordinances, and rules regulating the construction of buildings "serve to increase costs without providing correlative benefits of safety to owners, builders, tenants, and users of buildings"). The statute therefore provides:

> The State Building Code applies statewide and supersedes the building code of any municipality. A municipality must not by ordinance or through development agreement require building code provisions regulating components or systems of any residential structure that are different from any provision of the State Building Code.

Minn.Stat. § 16B.62, subd. 1. The parties agree that this language controls the resolution of this case. We turn next to the application of the plain wording of the statute.

## II.

As noted above, the State Building Code currently provides that "[a] municipality must not by ordinance or through development agreement require building code provisions regulating components or systems of any residential structure that are different from any provision of the State Building Code." Minn.Stat. § 16B.62, subd. 1. By its express terms, this language prohibits a municipal ordinance if (1) the ordinance is a building code provision; (2) it regulates a component or system of a residential structure; and (3) it is different from a provision of the State Building Code.

### A. Building Code Provision

■ With respect to the first element of the express prohibition on municipal regulations of residential structures, the City asserts that the provisions of the Rental Licensing Ordinance are not "building code provisions." Based on *Mark Z. Jones,* the City argues that the term "building code provisions" means that the regulation must affect "the design and construction" of the building, and the inspection standards at issue here do not relate to the design or the construction of Sax's building. *See Mark Z. Jones,* 306 Minn. at 220, 236 N.W.2d at 165. According to the City, the ordinance merely regulates the business of rental housing, and the inspection standards relate to the use of the residence as rental property and its habitability—not its design and construction. The district court and court of appeals appear to have accepted this argument.

The court of appeals concluded that the Rental Licensing Ordinance is not prohibited by the State Building Code because the ordinance regulates "the business of rental housing by enacting standards of habitability." *Sax Invs.*, 730 N.W.2d at 556.

We agree that the Rental Licensing Ordinance regulates the business of rental housing, but that conclusion does not resolve the issue presented in this case. Although we implicitly construed the term "building code" in *Mark Z. Jones* to include a regulation that "affects the construction and design of buildings," 306 Minn. at 219, 236 N.W.2d at 165, we did not purport to exclude from that definition subjects that are plainly covered by the State Building Code. Indeed, we said that our decision in that case was "influenced, if not governed," by the fact that the subject matter of the local ordinance was regulated by the State Building Code. *See id.* at 222, 236 N.W.2d at 167. In other words, if the subject of the regulation is included within the State Building Code, it is a "building code" regulation. We adopt the same reasoning in this case and conclude that the term "building code provision" means at least those subjects specifically regulated by the State Building Code.[1]

The City also argues that the term "building code provisions" is limited to regulations on the new construction of buildings and does not include regulations on the subsequent use of buildings. But the plain text of the State Building Code refutes this interpretation. The statutory statement of policy and purpose provides that "[t]he State Building Code governs the construction, *reconstruction, alteration, and repair* of buildings and other structures." Minn.Stat. § 16B.59 (emphasis added); *see also* Minn. Rule 1300.0040 (2005) (explaining that "[t]he code applies to the construction, alteration, moving, demolition, repair and use of any building * * * in a municipality").[2] Moreover, the State Building Code directly regulates the post-construction use of buildings through its use of occupancy classifications. The Code utilizes a system of occupancy classifications to tailor construction standards to different building types, and prohibits the use of a new building and changes in the occupancy classifications of an existing building unless the building complies with the code requirements that apply based on the intended use of the building. *See* Minn. R. 1300.0220 (2005). With respect to residential structures, the primary factors that distinguish between occupancy classes are (1) the transient or permanent nature of the typical occupants, and (2) the

---

1. Additionally, the City argues that our decision in *Mark Z. Jones* held that the State Building Code only prohibits municipal regulations that affect something that is "integral" to the design and construction of a building. *See* 306 Minn. at 218, 236 N.W.2d at 165. At one point in *Mark Z. Jones*, we did describe the specific fire prevention devices at issue as "an integral part of the construction of the building." *Id.* at 218, 236 N.W.2d at 165. But throughout our analysis and in our actual holding, we did not limit preemption to only those regulations that were an "integral part" of the design or construction of buildings. *See id.* at 219, 236 N.W.2d at 165 (holding that "insofar as local ordinances purport to adopt fire prevention measures which affect the design and construction of buildings, they are in conflict with the State Building Code which has preempted that field"). We likewise decline to engraft this limitation onto the statute in this case.

2. We apply the standards in effect at the time of the complaint, but we note that some of the applicable standards have changed since then. *See, e.g.*, Minn. R. 1309.0010 (2007) (generally adopting the 2006 edition of the International Residential Code by reference); Minn. R. 1309.0313 (2007) (addressing smoke alarm requirements for alterations, repairs or additions).

number of dwelling units in the structure.[3] Minn. R. 1305.0310 (2005). Significant to our analysis in this case is the fact that in defining the building standards applicable to residential buildings, the State Building Code does not distinguish between buildings that are owner-occupied and those that are used as rental property.

Finally, the State Building Code regulates the post-construction use of buildings by specifically allowing the occupancy of an existing building to continue without complying with current code requirements (nonconforming use) unless a code provision is "specifically applicable to existing buildings." 2000 Guidelines for the Rehabilitation of Existing Buildings § 104 (incorporated by reference into the State Building Code by Minn. R. 1311.0010 (2007)); *see also* Minn. R. 1300.0220, subp. 2 (stating that "[t]he legal occupancy of any structure existing on the date of adoption of the code shall be permitted to continue without change except as specifically required in chapter 1311"). In addition, the code does not permit existing conditions to continue if they are "unsafe" or "dangerous to human life." *See* Minn. R. 1300.0180 (2007); Minn. R. 1311.0206 (2007). We therefore conclude that the term "building code provisions" is not limited to regulation of the new construction of buildings but may also include regulation on the subsequent use of a building.

*B. Components or Systems*

◼ With respect to the second element of the express prohibition on municipal ordinances, we are asked to determine the meanings of "components" and "systems" in Minn.Stat. § 16B.62, subd. 1. When interpreting a statute, we "construe words and phrases according to their plain and ordinary meaning." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000); *see also* Minn.Stat. § 645.08(1) (2006). Although the statute itself does not define the terms "components" and "systems," the administrative rules incorporate the Merriam–Webster Collegiate Dictionary, available at www.m-w.com, as the source of "ordinarily accepted meanings" for undefined terms in the State Building Code. Minn. R. 1300.0070, subp. 1 (2007); *see also* Minn. R. 1309.0201 (2007) (providing that the Merriam–Webster Collegiate Dictionary "shall be considered as providing ordinarily accepted meanings" for terms in the International Residential Code). According to the Merriam–Webster Collegiate Dictionary, a "component" is "a constituent part." "System," meanwhile, is defined as "a regularly interacting or interdependent group of items forming a unified whole," or more specifically, "a group of devices or artificial objects or an organization forming a network especially for distributing something or serving a common purpose." Because the administrative rules incorporate the definitions from this source, we apply these definitions in determining the scope of the municipal regulations that are prohibited under the State Building Code.

*C. Different from*

◼ Finally, we consider the third element of the express prohibition on municipal ordinances: whether the municipal building code provision is "different from" any provision of the State Building Code. Minn.Stat. § 16B.62, subd. 1. Although the meaning of "different from" does not require extensive discussion, we do note that "different from" does not mean "in conflict with." For example, in *State v.*

---

**3.** The State Building Code also provides for a separate residential building classification consisting of residential care and assisted living facilities serving between 6 and 16 occupants. *See* Minn. R. 1305.0310 (2005).

*Kuhlman,* 729 N.W.2d 577 (Minn.2007), we interpreted the uniformity requirement of the Minnesota Traffic Regulations, which provides that the provisions of Minn.Stat. ch. 169 (2006) "shall be applicable and uniform throughout this state" and that "no local authority shall enact or enforce any rule or regulation *in conflict with* the provisions of this chapter unless expressly authorized herein." Minn.Stat. § 169.022 (emphasis added). In *Kuhlman,* we concluded that "no conflict exists when an ordinance is merely additional and complementary to a state law and covers specifically what the statute covers generally." 729 N.W.2d at 581. In contrast, under Minn.Stat. § 16B.62, subd. 1, any difference from the State Building Code is prohibited. Thus, even a provision that is merely additional and complementary to a provision in the State Building Code is prohibited.

### III.

With these definitions in mind, we proceed to analyze whether the four inspection standards at issue here fall within the State Building Code's express prohibition on municipal ordinances. The Rental Licensing Ordinance requires that residential buildings comply with several inspection standards before they may be used as rental property. The inspection standards at issue here require that (1) ground fault interrupter receptacles be installed on certain electrical outlets; (2) bathrooms receive ventilation from either an exterior window or a mechanical ventilation system; (3) rigid covers be installed over all egress windows; and (4) smoke detectors be installed in every sleeping room.

### A. *Ground Fault Interrupter Receptacles*

■ We look first at the ordinance provision requiring ground fault interrupter receptacles. The Rental Licensing Ordi-

nance provides that "[r]eceptacles in bathrooms, kitchens, and laundry rooms must be [ground fault interrupters] where receptacles are within 6 feet of a water supply." Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(b) (Section 2.02). A ground fault interrupter receptacle is a safety device that replaces a standard outlet and protects against electrical shocks by switching off the power to a circuit if it senses any loss in current. *See* U.S. Consumer Product Safety Commission, *GFCIs Fact Sheet,* http://www.cpsc.gov/cpscpub/pubs/99.html (last visited Apr. 29, 2008). Because they replace standard electrical outlets, ground fault interrupter receptacles work with the other devices that comprise a building's electrical system (i.e., wires, fuses or circuit breakers, and switches) to safely distribute electrical power for use throughout the building.

The Minnesota State Building Code requires that ground fault interrupter receptacles be used for outlets in several specific areas throughout dwelling units, including outlets in bathrooms, outlets installed to serve kitchen countertop surfaces, and outlets in laundry rooms near sinks. *See* 2002 National Electrical Code § 210.8; Minn. R. 1315.0200 (2005) (providing that "[a]ll new electrical wiring, apparatus, and equipment for electric light, heat, power, technology circuits and systems, and alarm and communication systems must comply with" the 2002 edition of the National Electrical Code, as approved by the American National Standards Institute, Minn.Stat. § 326.243, and the Minnesota State Building Code). Because this provision is not specifically applicable to existing buildings, the nonconforming use provisions of the State Building Code, Minn. R. 1300.0220, subp. 2, allow the continued use of an existing building without the installation of ground fault interrupter receptacles. *See*

Minn. R. 1315.0200; 2002 National Electrical Code § 210.8.

We conclude that the provision of the Rental Licensing Ordinance requiring the use of ground fault interrupter receptacles meets all three elements of the prohibition on municipal ordinances in the State Building Code, Minn.Stat. § 16B.62, subd. 1. First, because ground fault interrupter receptacles are regulated by the State Building Code, this provision of the ordinance is a building code provision. Second, the ordinance also regulates a component or system of a residential structure by mandating the inclusion of a specific device in the electrical system of a residential structure. Finally, although the State Building Code permits the continued use of an existing residential structure without the installation of these devices, the ordinance requires these devices. We therefore conclude that this provision is invalid under the State Building Code.

*B. Bathroom Ventilation*

 We look next at the ordinance provision pertaining to bathroom ventilation. The Rental Licensing Ordinance requires ventilation in a bathroom from either "openable exterior openings"—i.e., windows—or "a mechanical ventilation system connected directly to the outside." Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(f) (Section 4.02).[4] This provision thus requires the incorporation of either a window or a mechanical ventilation system into the structure itself.

The State Building Code requires that bathrooms contain either a window that opens or "artificial light and a mechanical ventilation system" that exhausts air directly to the outside. 2000 International Residential Code § R303.3; *see* Minn. R. 1309.0010, subp. 1 (2005) (generally incorporating the 2000 edition of the International Residential Code into the Minnesota State Building Code by reference, with certain exceptions). A bathroom ventilation system, however, is not a requirement for existing residential buildings. *See* Minn. R. 1300.0220, subp. 2.

We conclude that the Rental Licensing Ordinance provision requiring ventilation in bathrooms meets all three elements of the prohibition on municipal ordinances in the State Building Code, Minn.Stat. § 16B.62, subd. 1. Because bathroom ventilation is covered by the State Building Code, this provision of the ordinance is a building code provision. Moreover, by requiring the creation of an opening in the exterior shell of a building and the installation of a window or mechanical ventilation system in a bathroom, the provision regulates the components of a residential structure. And finally, like the ordinance's regulation of ground fault interrupter receptacles, this provision differs from the State Building Code because the Code allows the continued nonconforming use of a residential building without a

---

4. Section 4.02 states in full:

Bathrooms, water closets, laundry rooms and similar rooms shall be provided with natural ventilation by means of openable exterior openings with an area not less than one twentieth of the floor area of such rooms with a minimum of 1½ square feet.

In lieu of required exterior openings for natural ventilation in bathrooms containing a bathtub or shower or combination thereof, laundry rooms, and similar rooms, a mechanical ventilation system connected directly to the outside capable of providing five air changes per hour shall be provided. The point of discharge of exhaust air shall be at least 3 feet from any opening into the building. Bathrooms which contain only a water closet and lavatory, and similar rooms, may be ventilated with an approved mechanical system and shall not be recirculated.

Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(f) (Section 4.02).

bathroom ventilation system. Therefore, this provision of the municipal ordinance is invalid under the State Building Code.

### C. Egress Window Covers

■ Next, we consider the provision of the Rental Licensing Ordinance regarding egress windows. The ordinance requires rigid covers over basement egress windows. Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(c) (Section 6.02).[5] The State Building Code, however, expressly makes egress window covers optional:

> Bars, grills, covers, screens or similar devices are *permitted* to be placed over emergency escape and rescue openings, bulkhead enclosures, or window wells that serve such openings, provided * * * such devices shall be releasable or removable from the inside without the use of a key, tool or force greater than that which is required for normal operation of the escape and rescue opening.

2000 International Residential Code § R310.4 (emphasis added); *see* Minn. R. 1309.0010, subp. 1.

We conclude that the Rental Licensing Ordinance provision requiring the installation of covers over egress windows meets all three elements of the prohibition on municipal ordinances in the State Building Code, Minn.Stat. § 16B.62, subd. 1. Because egress window covers are regulated by the State Building Code, this provision is a building code provision. Moreover, windows are incorporated into the structure of a building and therefore are components of that structure. The ordinance requires the installation of an additional device on some of these components and therefore constitutes a regulation of that component. It also directly requires that which the State Building Code leaves to the discretion of the building owner, and is therefore different from the State Building Code. Thus, this provision of the ordinance is invalid under the State Building Code.

### D. Smoke Detectors

■ Finally, we address the smoke detector provision of the Rental Licensing Ordinance. The ordinance provides that "[a]ny room used for sleeping purposes shall be provided with smoke detectors." Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(c) (Section 2.01).[6] The State Building Code also requires the installation of smoke detectors "[i]n each sleeping room" and in other locations throughout the structure. 2000 International Residential Code § R317.1; *see* Minn. R. 1309.0010, subp. 3 (2005) (incorporating by reference the 2000 International Residential Code "Section R317 Smoke Alarms" into the State Building Code). Like the provisions discussed

---

**5.** Section 6.02 states in full:

> Window Coverings–Egress window wells must be covered and free of any obstruction. Window well covers are *required* for each egress window. Covers shall be of rigid and transparent or translucent material with framework of decay resistant material or manufactured covers designed to fit a window well.

Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(c) (Section 6.02) (emphasis added).

**6.** Section 2.01 states in full:

> Smoke Detectors/Alarms—Any room used for sleeping purposes shall be provided with smoke detectors. Detectors shall be installed in accordance with the approved manufacturer's instructions. When a dwelling unit has more than one story and in dwellings with basements, a detector shall also be installed on each story including the basement. Detectors shall sound an alarm audible in all sleeping areas of the dwelling unit in which they are located. All smoke detectors shall be maintained operational at all times.

Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(c) (Section 2.01).

above, however, the State Building Code's smoke detector requirements are not specifically applicable to existing residential structures. *See* Minn. R. 1300.0220, subp. 2.

But the State Building Code also requires that all dwellings must comply with Minn.Stat. § 299F.362 (2006), which addresses smoke detector requirements. Minn.Stat. § 16B.61, subd. 3(b) (2006). Section 299F.362 requires that all dwellings be outfitted with smoke detectors as required by the State Fire Code, *id.,* subds. 3–3a, and generally prohibits a municipality from adopting smoke detector requirements that are different from the State Fire Code, *id.,* subd. 7. *See also* Minn. R. ch. 7511 (2007) (the Minnesota State Fire Code). Local governing bodies, however, are specifically authorized to adopt more restrictive smoke detector requirements for single-family homes: "Notwithstanding subdivision 7, *or other law,* a local governing body may adopt, by ordinance, rules for the installation of a smoke detector in single-family homes in the city that are more restrictive than the standards provided by this section." Minn. Stat. § 299F.362, subd. 9 (emphasis added). If the building at issue in this case is a single-family home, the smoke detector provision of the Rental Licensing Ordinance would be expressly permitted by section 299F.362, subdivision 9, and would therefore not be different than the State Building Code. But because the record in this case does not reveal whether the building owned by Sax is a single-family home, we cannot determine whether the ordinance provision requiring the installa-

tion of smoke detectors in each sleeping room is invalid under state law. Accordingly, we remand this issue to the district court for further proceedings.

## IV.

The City of Morris and the amici curiae City of Saint Paul, City of Rochester, and League of Minnesota Cities argue that municipalities must, as a matter of public policy, have the authority to enforce habitability standards to protect the health and safety of tenants from substandard housing. The cities assert that property owners do not have the same incentives to maintain rental property as they do their own residences, and tenants generally have little leverage to require landlords to address habitability problems. We recognize that substandard housing raises health and safety issues for municipalities, and that disposition of this case raises considerations about the ability of municipalities to address these issues. But regardless of our view on the merits of these policy arguments, we are bound to apply the policy decisions adopted by the legislature and embodied in the State Building Code. In this case, the plain statutory text clearly indicates that the City's building code provisions regulating ground fault interrupter receptacles, bathroom ventilation, and egress window covers are invalid because they are "different from" the State Building Code. Minn.Stat. § 16B.62, subd. 1.[7]

## V.

 Finally, the City of Morris argues that the four ordinance violations at issue

---

7. Our decision should not be misconstrued as precluding all municipal regulation of rental housing. For example, municipalities are permitted to require that a residential structure be inspected and found to comply with valid state and local regulations—including the "dangerous to human life" provisions of the State Building Code—before a rental li-

cense is issued for the property. *See* Minn. Stat. § 16B.62, subd. 1 (discussing the adoption and enforcement of State Building Code by municipalities); *see also* Minn.Stat. § 504B.161, subd. 1(3) (2006) (requiring that landlords comply with "health and safety laws of the state * * * and of the local units of government where the premises are locat-

in this case involve unsafe conditions that should be considered "dangerous to human life," which allows the City to take action against the property. *See* Minn. R. 1311.0206 (requiring a building official to order a building vacated "if its continued use is dangerous to life, health, or safety" and requiring all unsafe buildings to be "abated by repair, rehabilitation, demolition, or removal"). But Sax's property was not cited as being "dangerous to life, health, or safety," and this issue was not raised in the City's complaint. In addition, this issue was not argued to either the district court or the court of appeals, and was not raised in connection with Sax's petition for further review. We therefore conclude that this issue is not properly before us. *See Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988).

Because we conclude that the City's regulations requiring ground fault interrupter receptacles, ventilation in bathrooms, and egress window covers are building code provisions that regulate a component or system of a residential structure and are different from the State Building Code, these regulations are invalid under Minn. Stat. § 16B.62, subd. 1. But because the factual record is insufficient to determine whether the regulation requiring smoke detectors in every sleeping room is permitted under state law, we remand this issue to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

ed"). In addition, municipal rental housing regulations are not prohibited by the State Building Code if they do not regulate components or systems of a residential structure

DISSENT

ANDERSON, PAUL H., Justice (concurring in part and dissenting in part).

I respectfully dissent. I agree with the majority that the provisions of the municipal ordinance regulating ground fault interrupter receptacles and bathroom ventilation are prohibited by the State Building Code. But I conclude that egress window coverings are not "components or systems" of a "residential structure" and therefore may be regulated under the municipal ordinance. Minn.Stat. § 16B.62, subd. 1 (2006).

The majority correctly concludes that "ground fault interrupter receptacles work with the other devices that comprise a building's electrical system." I therefore agree that such receptacles are part of the system of a residential structure, and thus the State Building Code prohibits municipalities from regulating them in a way that differs from the Code. Similarly, a bathroom ventilation provision that requires "the incorporation of either a window or a mechanical ventilation system into the structure itself, *see* Morris, Minn., Rental Licensing Ordinance § 4.32, subd. 21(f), § 4.02 (2002)," regulates a component of a residential structure because it affects a "constituent part" of that structure. Thus the State Building code also prohibits municipalities from regulating bathroom ventilation differently.

Unlike ground fault interrupter receptacles and bathroom ventilation, I conclude that coverings on egress windows are neither "systems" nor "components" of a residential structure. The majority

---

covered by the State Building Code and are not different from any provisions in the State Building Code. This leaves many permissible areas of regulation.

reasons that because egress windows are components of a residential structure, and because an ordinance requiring window covers requires the installation of an additional device on these components, the ordinance regulates the components themselves. While I agree that an egress window itself may be a component of a residential structure, extending the definition of "component" to include the window cover goes too far.

An egress window cover is an external add-on that is neither a part of the structure itself, nor a part of any systems that are part of the structure. Because egress window covers easily attach to the outside surface of a window on a residential structure (if they are attached at all), regulation of such covers would not require an owner to rewire anything within the structure, as would the installation of ground fault interrupter receptacles, or to cut into walls or any other part of the structure, as would bathroom ventilation regulations. Because the State Building Code explicitly states that only "building code provisions regulating components or systems of any residential structure" are prohibited, Minn.Stat. § 16B.62, subd. 1, and because I conclude that egress window coverings are not "components or systems," I further conclude that the State Building Code does not prohibit the regulation of egress window covers. Thus, I would hold that the district court did not err when it concluded that the municipality's ordinance provision requiring the installation of rigid covers over basement egress windows is valid under the State Building Code.