Ethan **DEAN, et al., Appellants,**

v.

**CITY OF WINONA, Respondent.**

No. A13–1028.

Court of Appeals of Minnesota.

Feb. 24, 2014.

---

Lee U. McGrath, Anthony Sanders, Katelynn McBride, Institute for Justice, Minneapolis, MN, for appellants.

George C. Hoff, Shelley M. Ryan, Hoff, Barry & Kozar, P.A., Eden Prairie, MN, for respondent.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN.

Daniel E. Frank, (pro hac vice), Sutherland Asbill & Brennan LLP, Washington, D.C., for amicus curiae The Minnesota Free Market Institute at Center of the American Experiment.

Jarod M. Bona, Ann A. Parmley, Alvin Johnson Jr., DLA Piper LLP, Minneapolis, MN, for amicus curiae Minnesota Vacation Rental Association.

Teresa J. Nelson, American Civil Liberties Union of Minnesota, St. Paul, MN, for amicus curiae American Civil Liberties Union of Minnesota.

Considered and decided by CONNOLLY, Presiding Judge; WORKE, Judge; and LARKIN, Judge.

## OPINION

LARKIN, Judge.

Appellants, owners of residential properties in respondent municipality, challenge the summary judgment upholding respondent's ordinance that limits, to 30%, the number of lots on a block that are eligible to obtain certification as a rental property. Because respondent's adoption of the ordinance was an authorized exercise of its police power and because appellants have not met their burden to show that the ordinance is unconstitutional, we affirm.

## FACTS

This case stems from respondent City of Winona's adoption of an ordinance that limits, in certain districts of the city, the number of lots on a block that are eligible to obtain certification as a rental property. In 2003, respondent's city council requested that its planning commission consider the effectiveness of respondent's off-street parking regulations, particularly regarding rental properties, and most significantly around the Winona State University campus. Members of the planning commission noted that an increasing number of residential properties were being converted from single-family usage to rental usage, which resulted in increased parking demands. One of the suggested solutions to the problem was limiting the number of rental properties per block in residential areas.

In December 2004, respondent's city council issued a six-month moratorium on the certification of new rental housing. During the moratorium, the planning commission initiated discussions and developed a list of proposed code modifications pertaining to rental housing density and off-street parking issues. Later, the planning commission held a series of public-input meetings with landlords, homeowners, and others. In April 2005, in conjunction with the planning-commission discussions, respondent's mayor initiated a series of town meetings designed to address "density, parking, and aesthetic issues within the 'area' of the university." Landlords, homeowners, students, and others attended the meetings. After the last meeting, the mayor created a core study group to identify issues and possible solutions pertaining to university neighborhoods for the planning commission's consideration. The council extended the moratorium for an additional six months to allow the study group and planning commission to complete their work.

A Parking Advisory Task Force was also formed in 2005 to consider the same issues and the planning commission's proposals. The task force noted that at that time, rental-housing units comprised about 39% of respondent's total housing units, but 52% of the complaints received by the Community Development Department (CDD) related to rental properties. In August of 2005, the task force began discussing the idea of restricting the number of rental properties per block. Because rental housing units comprised approximately 39% of the total housing units, it was suggested that the number of rental units be restricted to 30% of the total properties on any given block. The task force adopted a motion to forward a "30% rule" to the planning commission for its consideration. The task force acknowledged that such a rule could prevent out-of-town individuals from purchasing residential property in Winona and that it could hinder the ability of current residents to sell their properties. Nonetheless, the task force favored the 30% rule and decided to seek studies and findings on the effect of rental housing on the area.

The planning commission discussed the 30% rule at two meetings in October 2005. It noted that the task force believed that neighborhoods heavily populated with student rental housing tend to become run-down and unattractive. The planning commission noted that according to county data from 2004, the CDD found that 95 of the 99 addresses that had two or more calls for police service based on noise and party-related complaints were rental properties. The planning commission also noted that 52% of the zoning violations that resulted in written violations during 2004 were for rental properties. After holding a public hearing on the issue, the planning commission voted six to three to recommend the 30% rule to respondent's city council.

The city council held a public meeting regarding the rule in November 2005. Several members of the community spoke for and against the rule. Opponents voiced concern that property values would suffer. Proponents voiced a desire to protect neighborhoods and prevent areas from becoming dominated by rental units. The city council passed the 30% rule at the meeting and adopted the rule on December 5.

In February 2009, the planning commission once again considered the 30% rule. The city planner noted that 142 residential properties had been certified for rental since the rule was enacted and that those units were dispersed throughout Winona rather than concentrated. But planning-commission members disagreed regarding whether or not the rule was working.

In March, the city council created a new task force to examine the 30% rule. Its goal was to consider ways for residents to rent their homes in extraordinary circumstances despite the 30% cap, as well as ways to encourage the conversion of rental properties into owner-occupied properties. In February 2010, the task force recommended that respondent retain the 30% rule. The task force noted that "[a]lthough the general consensus of the Task Force was that the Rule has, since adoption, had the intended [effect] of dispersing rental patterns away from core university neighborhoods, not all were supportive of the method." The CDD's program development director described the 30% rule as having "preserved affordable housing and reduced conversions as intended."

In October 2011, appellants Ethan Dean, et al., filed the underlying lawsuit. Appellants, collectively, were the owners of three houses purchased after adoption of the 30% rule. Appellant Ethan Dean purchased his house in 2006, planning to live

in it. In 2009, Dean was preparing for a military tour in Iraq and wanted to rent the house out. He could not obtain rental certification because of the 30% rule. At the time of the summary-judgment proceeding in district court, Dean had obtained temporary certification and had been renting his house out since 2010.

Appellant Holly Richard also purchased her house in 2006. In 2009, she accepted a job in another state. She tried to sell her house, but after receiving no offers, she decided to rent it out. She was unable to obtain rental certification because of the 30% rule. Richard entered into a rent-with-the-option-to-buy agreement with a tenant. In February 2010, respondent discovered the rental arrangement and ordered the tenant to vacate the property. At the time of the summary-judgment proceeding, Richard had been renting her house out since April 2010. She first obtained temporary certification. Later, she obtained standard rental certification after the license of another property on her block lapsed.[1]

Appellants Ted and Lauren Dzierzbicki, Illinois residents at the time of the summary-judgment proceeding, purchased a house in Winona in 2007, where their daughter attended college. They made improvements to the house, intending that their daughter would live in it and rent space in the house to other students. The Dzierzbickis could not obtain rental certification because of the 30% rule. Their house has been empty since the spring of 2010, when their daughter graduated.

Appellants' lawsuit challenges the 30% rule as an *ultra vires* act exceeding respondent's zoning powers and as unconstitutional under the Minnesota Constitution.

Appellants seek declaratory and injunctive relief, as well as nominal damages.

In February 2012, the planning commission received the report of a consulting firm, the Hoisington Koegler Group Inc. (HKG), which had been retained to review the literature on the impact of rental-housing concentration on neighborhood quality and liveability. The HKG report considered five other cities in addition to Winona and concluded that "the concentration of rental housing in Winona results in increased levels of nuisance and police violations in those neighborhoods" and that "the concentration of rental housing leads to a decreased neighborhood quality and liveability."

Also in February 2012, the planning commission discussed moving the 30% rule from chapter 43, the zoning chapter of respondent's code, to chapter 33A, the rental-housing chapter, partly because respondent's charter provided additional legal authority for the 30% rule and partly because other cities codified similar provisions in housing codes instead of in zoning codes. The 30% rule was moved to its present location in respondent's rental-housing code in March 2012.

In 2012, all parties moved for summary judgment. They agreed that there were no genuine issues of material fact and that the matter would be appropriately decided as a matter of law. After a January 2013 hearing, the district court denied appellants' motion and granted summary judgment to respondent.

## ISSUES

I. Is the 30% rule an *ultra vires* act that exceeds the powers delegated to

---

1. Appellants Dean and Richard remain in this lawsuit with claims for nominal damages. Respondent moved to dismiss them from the suit for lack of standing. That motion was denied, and the denial is not challenged on appeal.

respondent by the Minnesota legislature?

II. Have appellants shown that the 30% rule is unconstitutional?

## ANALYSIS

The case comes before us on appeal of the district court's award of summary judgment. The standard of review in an appeal from summary judgment is de novo. *Allen v. Burnet Realty, LLC,* 801 N.W.2d 153, 156 (Minn.2011).

The ordinance giving rise to the underlying dispute provides in relevant part:

**33A.03—RENTAL HOUSING LICENSE**

. . . .

(i) Limitation of rental housing in low density neighborhoods. In [certain] districts of the city, no more than 30 percent (rounded up) of the lots on any block shall be eligible to obtain certification as a rental property, including homes in which roomers and/or boarders are taken in by a resident family.... When determining the number of eligible properties on a block, the number shall be the lowest number that results in 30 percent or more of the residential lots being rental.

Winona, Minn., City Code ch. 33A.03(i) (2013).

There is an exception for rental properties that were certified when the 30% rule was adopted, but such properties are counted among the 30% of allowable rental properties for purposes of determining whether new properties may be certified. *Id.* The ordinance also allows for temporary certification under limited circumstances. *Id.*

Appellants argue that the 30% rule is an *ultra vires* act that exceeds the powers delegated to respondent by the Minnesota legislature. Appellants also argue that the 30% rule violates their rights, under the Minnesota Constitution, to equal protection, substantive due process, and procedural due process. We address each argument in turn.

### I.

■ Appellants argue that respondent "lacks the power to enact the 30 percent rule." Respondent counters that the 30% rule is a valid exercise of its broad police power under the "all powers" grant in the City of Winona Charter.

■ Respondent, a home rule charter city, has by virtue of its charter "all powers, rights, privileges and immunities granted to it by this Charter and by the constitution and laws of the State of Minnesota and all powers existing in a municipal corporation at common law." Winona, Minn., City Charter ch. 1.02 (1983). "[A home rule charter city] may provide . . . for the regulation of all local municipal functions as fully as the legislature might have done before home rule charters for cities were authorized by constitutional amendment in 1896." Minn. Stat. § 410.07 (2012). "[I]n matters of municipal concern, home rule cities have all the legislative power possessed by the legislature of the state, save as such power is expressly or impliedly withheld." *Bolen v. Glass,* 755 N.W.2d 1, 4–5 (Minn.2008) (quotation omitted).

■ Generally, police power "refers to the power of the state and its political subdivisions to impose such restraints upon private rights as are necessary for the general welfare. This government power is essential and difficult to limit, as it includes all matters of public welfare." *In re 1994 and 1995 Shoreline Improvement Contractor Licenses of Landview Landscaping, Inc.,* 546 N.W.2d 747, 750

(Minn.App.1996) (quotations omitted), *review denied* (Minn. June 11, 1996).

■ The concept of police power has a long history in Minnesota. "The term 'police power' . . . means simply the power to impose such restrictions upon private rights as are practically necessary for the general welfare of all." *State ex rel. Beek v. Wagener*, 77 Minn. 483, 494, 80 N.W. 633, 635 (1899).

> [I]n the exercise of its police powers a state is not confined to matters relating strictly to the public health, morals, and peace, but, as has been said, there may be interference whenever the public interests demand it; and in this particular a large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If, then, any business becomes of such a character as to be sufficiently affected with public interest, there may be a legislative interference and regulation of it in order to secure the general comfort, health, and prosperity of the state, provided the measures adopted do not conflict with constitutional provisions, and have some relation to, and some tendency to accomplish, the desired end.

*Id.* at 495, 80 N.W. at 635 (citation omitted).

■ The breadth of police power is equally well established. "The development of the law relating to the proper exercise of the police power of the state clearly demonstrates that it is very broad and comprehensive, and is exercised to promote the general welfare of the state. . . . And the limit of this power cannot and never will be accurately defined. . . ." *Id., see also City of St. Paul v. Dalsin*, 245 Minn. 325, 329, 71 N.W.2d 855, 858 (1955) ("Judicial concepts of what is a sufficient public interest to invoke the police power, and of whether a certain remedy is reasonably appropriate to accomplish its purpose without going beyond the reasonable demands of the occasion so as to be arbitrary, are not static but are geared to society's changing conditions and views.").

■ We easily conclude that the public has a sufficient interest in rental housing to justify a municipality's use of police power as a means of regulating such housing. *See City of Morris v. Sax Investments, Inc.*, 749 N.W.2d 1, 13–14 n. 7 (Minn.2008) (recognizing that there are "many permissible areas" for "municipal regulation of rental housing"). In fact, the landlord-tenant relationship is currently subject to extensive government regulation. *See* Minn.Stat. §§ 504B.001–.471 (2012) (governing landlord-tenant relationships). In this case, the record establishes that respondent determined that the conversion of owner-occupied homes to rental properties and the concentration of such properties in some neighborhoods began to have a negative impact on the quality and liveability of those neighborhoods. That occurrence implicated the public interest and welfare. Because "there may be interference whenever the public interests demand it," respondent was authorized to address the circumstances through its police power so long as, "the measures adopted [did] not conflict with constitutional provisions, and [had] some relation to, and some tendency to accomplish, the desired end." *Wagener*, 77 Minn. at 495, 80 N.W. at 635.

Appellants do not persuasively dispute respondent's authority to regulate rental housing within its borders through its police power. Instead, appellants contend that the ordinance was an exercise of respondent's statutory zoning power and not an exercise of its police power. Appellants

further contend that the ordinance was not a valid exercise of zoning authority. *See* Minn.Stat. § 462.357, subd. 1 (2012) (setting forth municipal zoning authority). Because we conclude that respondent's adoption of the ordinance was an exercise of its police power, it is not necessary to determine whether it was also an exercise of its zoning authority. We therefore do not address appellants' zoning arguments.

In sum, respondent's adoption of the 30% rule was an authorized exercise of police power, subject to constitutional limitations. *See Wagener,* 77 Minn. at 495, 80 N.W. at 635. Because the validity of respondent's exercise of police power is determined under the analysis applicable to appellants' constitutional claims, we turn our attention to those claims.

## II.

Appellants argue that the 30% rule "conflict[s] with constitutional provisions." *Id.* Specifically, they argue that it violates their rights to equal protection, substantive due process, and procedural due process under the Minnesota Constitution. *See* Minn. Const. art. I, §§ 2 ("No member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."), 7 (stating that no person shall "be deprived of life, liberty or property without due process of law"). Appellants state that their constitutional claims "are both facial and as applied."

■■■■ "The constitutionality of an ordinance is a question of law[,] which this court reviews de novo." *Hard Times Cafe, Inc. v. City of Minneapolis,* 625 N.W.2d 165, 171 (Minn.App.2001) (quotation omitted). A municipal ordinance is presumed to be constitutional, and the burden of proving that it is unconstitutional is on the party challenging it. *Minnesota Voters*

*Alliance v. City of Minneapolis,* 766 N.W.2d 683, 688 (Minn.2009); *see also Bodin v. City of St. Paul,* 303 Minn. 555, 558, 227 N.W.2d 794, 797 (1975) ("A successful challenge to … legislation [allegedly resulting in unequal treatment of persons similarly situated] requires proof of unconstitutionality beyond a reasonable doubt. The burden to overcome this stringent presumption is upon the party alleging the unconstitutionality of the provision at issue." (footnote omitted)). "If the reasonableness of an ordinance is debatable, the courts will not interfere with the legislative discretion." *Holt v. City of Sauk Rapids,* 559 N.W.2d 444, 445 (Minn.App.1997) (quotation omitted), *review denied* (Minn. Apr. 24, 1997).

### A. Equal Protection

■■■■ "A party may raise an equal protection challenge to a statute based on the statute's express terms, that is, a 'facial' challenge, or based on the statute's application, that is, an 'as-applied' challenge." *State v. Richmond,* 730 N.W.2d 62, 71 (Minn.App.2007), *review denied* (Minn. June 19, 2007). "By definition, a facial challenge to a statute on equal protection grounds asserts that at least two classes are created by the statute, that the classes are treated differently under the statute, and that the difference in treatment cannot be justified." *In re McCannel,* 301 N.W.2d 910, 916 (Minn.1980). A facially neutral statute can violate equal protection if it is applied in a way that creates an impermissible classification or discriminates in practice. *See State v. Frazier,* 649 N.W.2d 828, 833–34 (Minn.2002) (explaining that to prevail on an equal-protection challenge where the challenged statute did not, on its face, classify on the basis of race, the challenger had to "demonstrate that the statute create[d] a racial classification in practice"); *McCannel,* 301

N.W.2d at 916 (stating that "the equal protection clause provides protection against arbitrary discrimination resulting from the express terms of a statute as well as from a statute's improper execution"); *State v. Stewart*, 529 N.W.2d 493, 497 (Minn.App.1995) (holding that an ordinance violated due process and equal protection rights based on the city's arbitrary application and enforcement of the ordinance).

 An equal-protection challenge requires an initial showing that "similarly situated persons have been treated differently." *State v. Cox*, 798 N.W.2d 517, 521 (Minn.2011) (quotation omitted). In determining whether two groups are similarly situated, the focus is on "whether they are alike in all relevant respects." *Id.* at 522. Appellate courts "routinely reject equal-protection claims when a party cannot establish that he or she is similarly situated to those whom they contend are being treated differently." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 656 (Minn.2012) (quotation omitted).

The 30% rule is unlike laws that expressly identified groups that were to be treated differently and therefore violated equal protection under the Minnesota Constitution. *See State v. Russell*, 477 N.W.2d 886, 887, 889 (Minn.1991) (holding that Minn.Stat. § 152.023, subd. 2 (1990), violated equal protection because it imposed disparate treatment on two similarly situated groups: possessors of three or more grams of crack cocaine were guilty of a third-degree offense and possessors of less than ten grams of cocaine powder were guilty of a fifth-degree offense); *see also Weir v. ACCRA Care, Inc.*, 828 N.W.2d 470, 476 (Minn.App.2013) (holding that Minn.Stat. § 268.035, subd. 20(20) (2012), violated equal protection because it provided that immediate-family-member caregivers were not covered under the unemploy-

ment statutes but non-immediate-family-member caregivers were covered); *Healthstar Home Health, Inc. v. Jesson*, 827 N.W.2d 444, 447, 449, 453 (Minn.App. 2012) (holding that a pay cut imposed on relative caregivers but not on caregivers who were not related to their patients violated equal protection because both groups were "required to comply with the same statutes, rules and regulations" and therefore were similarly situated).

 The 30% rule does not set forth any facial classification providing a basis for disparate treatment, and it does not describe any particular group of property owners for whom certification is or is not available. The ordinance is facially neutral and applies equally to all property owners in the regulated districts. The ordinance sets a 30% cap, but it does not define or predetermine which lots will be certified. That determination is made based on the changing facts and circumstances on each block, and not based on the ordinance or the characteristics of lot owners. The fact that the number of lots that may be certified might be less than the number of property owners who desire certification is not a class-based distinction between two groups of property owners. Because the 30% rule does not provide that certification will be available to one particular group of property owners instead of to another, appellants fail to meet the threshold requirement of a facial equal-protection challenge by showing that the 30% rule treats similarly situated groups differently. *See Cox*, 798 N.W.2d at 521.

 Appellants also fail to present evidence of discrimination resulting from arbitrary application of the 30% rule. Appellants have not shown that respondent has done anything other than apply the mathematical formula on a first-come, first-served basis. Appellants' real complaint is about the effect of an otherwise

neutral ordinance on their particular circumstances, which does not give rise to an equal-protection claim. *See John Hancock Mut. Life Ins. Co. v. Comm'r of Revenue,* 497 N.W.2d 250, 254 (Minn.1993) (stating that "any difference of effect" that is the result of the unique circumstances of those affected by legislation does not give rise to an equal-protection claim). Appellants complain that the 30% rule unevenly affects owners who want to rent their properties. But any uneven effects are the result of the order in which property owners attempted to have their lots certified as rental properties and not the result of discriminatory treatment stemming from respondent's application of the ordinance. "The possibility that a law *may* actually fail to operate with equality is not enough to invalidate it." *Id.* (quotation omitted). Thus, appellants' as-applied equal-protection challenge is also unavailing.

Lastly, even if appellants did show that the 30% rule resulted in different treatment of similarly situated property owners, they would also have to show that the treatment was not merely different: only "invidious discrimination is deemed constitutionally offensive." *Scott v. Minneapolis Police Relief Ass'n, Inc.,* 615 N.W.2d 66, 74 (Minn.2000) (quotation omitted). Limiting the number of lots on a block that are eligible to obtain certification as a rental property does not rise to the level of invidious discrimination.

In sum, the 30% rule establishes a neutral, numerical limit on the number of lots that are eligible to obtain certification as a rental property and applies uniformly throughout the affected districts on a first-come, first-served basis. Because appellants did not make the necessary threshold showing that the 30% rule treats them differently than other similarly situated individuals, their equal-protection claim fails as a matter of law.

## B. Substantive Due Process

Appellants assert that the 30% rule violates their right to rent their property, asserting that such a right is "guaranteed by the substantive component of the Due Process Clause of Article I, Section 7 of the Minnesota Constitution." Appellants acknowledge that no published Minnesota case has "addressed the specific contours of how the clause protects that right." For the purpose of our analysis we assume, without deciding, that the right to rent is protected by the Due Process Clause of the Minnesota Constitution.

Unless a fundamental right is at stake, judicial scrutiny is not exacting and substantive due process requires only that the statute not be arbitrary or capricious; the statute must provide a reasonable means to a permissible objective. *State v. Behl,* 564 N.W.2d 560, 567 (Minn. 1997). Appellants do not argue that a fundamental right is at stake, so the rational-basis standard applies. *See Boutin v. LaFleur,* 591 N.W.2d 711, 717 (Minn. 1999) (stating that "even if a fundamental right is not implicated, in order to pass constitutional muster [a] registration statute must still meet the rational basis standard of review"). The rational-basis standard requires that: (1) "the act serve to promote a public purpose," (2) the act "not be an unreasonable, arbitrary or capricious interference" with a private interest, and (3) "the means chosen bear a rational relation to the public purpose sought to be served." *Contos v. Herbst,* 278 N.W.2d 732, 741 (Minn.1979). For the reasons that follow, we conclude that the rational-basis standard is met.

First, the 30% rule serves to promote a public purpose. The purpose of the ordinance is to control the number of owner-occupied homes that are converted to rental properties and to avoid heavy concentra-

tions of such converted properties. As we concluded in section I of this opinion, that purpose serves the public interest.

Second, the ordinance is not an unreasonable, arbitrary, or capricious interference with private interests. The 30% cap [2] was adopted after a long, deliberate information-gathering process that considered public input, data, and expert review, including the HKG memorandum. Appellants attempted to refute the HKG memorandum by arguing that it was based on the number of rental properties and that it should have been based on the number of rental units. But respondent's concern was not the number of renters in an area; it was the number of properties that went from being owner-occupied to rental properties. Appellants' adverse expert provided data based only on the density of rental units, not the density of rental properties, which is not relevant to the 30% rule or to the purpose for which it was enacted.[3]

Third, the 30% rule bears a rational relation to the public purpose sought to be served. There is an evident connection between the imposition of a numerical cap on the number of lots that may convert from owner-occupied properties to rental properties and the desire to control the number and concentrations of such converted properties. It is undisputed that the 30% rule has limit the number and location of converted properties, as it was intended to do.

In arguing their substantive-due-process claim, appellants primarily rely on two cases from other jurisdictions: *Gangemi v. Zoning Bd. of Appeals of Fairfield*, 255 Conn. 143, 763 A.2d 1011, 1017–18 (2001) (invalidating a no-rental condition that applied to only one property and therefore served no purpose and unfairly restricted the owners' ability to sell) and *Kirsch Holding Co. v. Borough of Manasquan*, 59 N.J. 241, 281 A.2d 513, 519–20 (1971) (invalidating ordinance prohibiting rental of seaside properties to groups of unrelated adults). Those cases are not binding on this court. *See Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 861 (Minn.1984) (noting that opinions of courts of other states may be persuasive but are not binding on Minnesota courts). Moreover, *Gangemi* is distinguishable because the 30% rule applies to all properties in the district, not to only one. *Kirsch Holding* is distinguishable because the 30% rule is not a restriction on who rents properties but on how many properties can be rented.

The only Minnesota case that appellants cite, *City of St. Paul v. Dalsin*, is also distinguishable. In *Dalsin*, the supreme court held that

> [t]he requirement that a roofer must qualify himself in warm air heating and ventilation has no reasonable relation to any justifiable regulation of the roofing trade. Since the ordinance embraces

---

**2.** Appellants do not argue that respondent should have used some percentage other than 30%. They argue that not having certification available for every residential property violates equal protection. We therefore do not address the propriety of the 30% cap as opposed to some other percentage. *See Holt*, 559 N.W.2d at 445 ("If the reasonableness of an ordinance is debatable, the courts will not interfere with the legislative discretion." (quotation omitted)).

**3.** In any event, the decision regarding whether certification is granted to properties or to individual rental units belongs to respondent's city council, not to this court. *See Holt*, 559 N.W.2d at 445 ("If the reasonableness of an ordinance is debatable, the courts will not interfere with the legislative discretion." (quotation omitted)). For the same reason, we do not address appellants' arguments that the 30% rule is not an effective means of improving parking or controlling student behavior. These issues are not within our scope of review. *See id.*

unnecessary, unreasonable, and oppressive requirements as a prerequisite to a license to install sheet metal flashings as an incidental part of the process of laying a roof, it must be held unconstitutional *insofar* as applies to the roofing trade.

245 Minn. at 330, 71 N.W.2d at 859. Unlike the requirement in *Dalsin*, the 30% cap on the number of lots that are eligible to obtain certification as a rental property has a reasonable relation to respondent's justifiable regulation of rental housing.

In sum, the ordinance provides a reasonable means to a permissible objective and appellants have not met their burden to show that the ordinance violates their substantive right to due process under the Minnesota Constitution.

## C. Procedural Due Process

■ Lastly, we consider appellants' procedural-due-process claim. Appellants contend that the 30% rule violates their "procedural due process right by unconstitutionally delegating legislative power to a property owner's neighbors." They argue that "[l]egislatures cannot delegate their power to a group of citizens," and that "[t]his rule of law is over 100 years old and guaranteed by the Minnesota Constitution." They assert that the 30% rule unconstitutionally transforms city blocks "into mini-republics, delegating the power to ban additional licenses to the [license-holding] property owners on each block."

Appellants primarily rely on *State ex rel. Foster v. City of Minneapolis*, 255 Minn. 249, 97 N.W.2d 273 (1959). *Foster* involved a piece of land that was originally zoned as commercial. 255 Minn. at 250, 97 N.W.2d at 274. The property was rezoned as residential after satisfaction of a statutory requirement that the owners of two-thirds of the properties "within 100 feet of the real estate affected" give their written consent. *Id.* When the owners of the property applied for a permit to construct an office building on the property, their request was denied based on the new zoning classification. *Id.*, 97 N.W.2d at 273–74. *Foster* held that the statutory requirement of consent of the owners of two-thirds of the properties "within 100 feet of the real estate affected" was "an unlawful delegation of power to impose restrictions on real property" and noted that "[w]him or caprice may [have been] the sole motivating factor" in the rezoning decision that "divested [the] property of all substantial value without compensation to [the purchasers]." *Id.* at 252, 254, 97 N.W.2d at 275–76.

In holding that the ordinance violated due process under the federal constitution, the supreme court explained:

> We are of the opinion that the consent clause of § 462.18, as a prerequisite to the exercise of the city council's legislative authority to amend the comprehensive zoning ordinance, constitutes an unlawful delegation of power to impose restrictions on real property, and renders this provision of the statute invalid. It is well settled that a municipal corporation may not condition restricted uses of property upon the consent of private individuals such as the owners of adjoining property; and that it is an unreasonable exercise of police power to rest control of property uses in the hands of the owners of other property.

*Id.* at 252–53, 97 N.W.2d at 275.

*Foster* is readily distinguishable. Under the 30% rule, the owners of certified rental properties do not determine which other lots may be certified. The certified-property owners' views regarding whether a particular lot should be certified as a rental property are irrelevant; they can neither grant certification by consenting to it nor prevent certification by denying con-

sent. Thus, respondent's limit on the number of lots on a block that are eligible to obtain rental certification is not a delegation of legislative power.

In sum, appellants have not shown that the 30% rule violates their right to procedural due process. Although we reject appellants' assertion that "the actions of [their] neighbors have denied them the right to rent," we in no way mean to diminish the impact of the 30% rule on appellants' ability to use their properties as they would like, and we are sympathetic to their circumstances. But appellants' dissatisfaction with the local majority's adoption of an ordinance limiting their ability to rent their residential properties is not a basis for the judiciary to strike down the ordinance as unconstitutional.

### DECISION

Respondent was authorized, under its broad police power, to adopt an ordinance limiting by percentage the number of lots on a block that are eligible to obtain certification as a rental property. Because the ordinance does not discriminate against any class of property owners, either on its face or in its application, and there is a rational basis for the ordinance, the ordinance does not violate equal protection or substantive due process. And because the ordinance does not delegate legislative power to other property owners, it does not violate procedural due process. We therefore affirm the district court's award of summary judgment to respondent.

**Affirmed.**