David BICKING, et al., Appellants,

v.

CITY OF MINNEAPOLIS,
et al., Respondents,

Ginny Gelms, in her official capacity as Elections Manager, Hennepin County, Respondent,

Police Officers' Federation of Minneapolis, intervenor, Respondent.

A16-1379

Supreme Court of Minnesota.

Filed: March 15, 2017

Jordan S. Kushner, Law Office of Jordan S. Kushner, Minneapolis, Minnesota, for appellants.

Susan L. Segal, Minneapolis City Attorney, Timothy S. Skarda, Tracey N. Fussy, Andrea K. Naef, Lindsey E. Middlecamp,

Assistant City Attorneys, Minneapolis, Minnesota, for respondents City of Minneapolis, et al.

Michael O. Freeman, Hennepin County Attorney, Daniel P. Rogan, Senior Assistant County Attorney, Minneapolis, Minnesota; and James P. Michels, Erik P. Bal, Rice, Michels, & Walther, LLP, Minneapolis, Minnesota, for respondent Police Officers' Federation of Minneapolis.

## OPINION

PER CURIAM.

Appellants David Bicking, Michelle Gross, Janet Nye, and Jill Waite (collectively, "Bicking") are members of a citizen group in Minneapolis that they contend they formed to advocate for measures to improve policing and police accountability in the City. In July 2016, Bicking's group submitted a petition to the Minneapolis City Council for consideration of a question regarding a proposed amendment to the Minneapolis City Charter to be placed on the ballot for the November 2016 general election. The amendment, as proposed by Bicking's group, would require City police officers to obtain and maintain professional liability insurance coverage and would impose other conditions for coverage and indemnification ("proposed insurance amendment"). The Minneapolis City Council directed the City Clerk not to include the proposed insurance amendment question on the ballot for the November 2016 election after concluding that the amendment conflicted with and was preempted by state law. Bicking filed a petition in Hennepin County District Court, under Minn. Stat. § 204B.44 (2016), to challenge that decision. The district court agreed with the Minneapolis City Council and dismissed the petition. We granted Bicking's petition for accelerated review. In an order filed August 31, 2016, we affirmed the order and judgment of the district court dismissing Bicking's petition, concluding that the proposed insurance amendment conflicts with state law. This opinion confirms the decision made in that order.

The facts are largely undisputed. Minneapolis is a home rule charter city. *See* Minn. Const. art. XII, § 4 (permitting "[a]ny local government unit . . . [to] adopt a home rule charter for its government"); Minn. Stat. § 410.04 (2016) (authorizing "[a]ny city in the state" to "frame a city charter for its own government in the manner" prescribed by chapter 410). "Subject to the limitations in" Minn. Stat. ch. 410 (2016), a charter "may provide for any scheme of municipal government not inconsistent with the constitution" and "may provide for the establishment and administration of all departments of a city government, and for the regulation of all local municipal functions, as fully as the legislature might have done before home rule charters for cities were authorized." Minn. Stat. § 410.07. Once a municipal charter is adopted, proposals to amend a charter can be made by the city's charter commission, *see* Minn. Const. art. XII, § 5; Minn. Stat. § 410.12, subd. 1; *see also* Minn. Stat. § 410.05, subd. 1 (explaining the appointment of a "charter commission to frame and amend a charter"); or "by a petition of five percent of the voters of the local government unit," Minn. Const. art. XII, § 5; *see* Minn. Stat. § 410.12, subd. 1 (authorizing "voters equal in number to five percent of the total votes cast" in the last general election to petition for charter amendments).

When voters submit a petition to amend the charter, the city clerk verifies the signatures on a petition, Minn. Stat. § 410.12, subd. 3, then forwards the proposed amendment to the city council for consideration of the form of a ballot question for the proposed amendment, *id.*, subd. 4. The

proposed charter amendment is then "submitted to the qualified voters" at a general election or at a special election. Minn. Stat. § 410.12, subd. 4.

Bicking's proposed insurance amendment, submitted to the Minneapolis City Council for consideration on July 11, 2016, would require Minneapolis police officers to carry professional liability insurance as the officer's "primary" insurance. Specifically, the proposed insurance amendment states as follows:

> Each appointed police officer must provide proof of professional liability insurance coverage in the amount consistent with current limits under the statutory immunity provision of state law and must maintain continuous coverage throughout the course of employment as a police officer with the city. Such insurance must be the primary insurance for the officer and must include coverage for willful or malicious acts and acts outside the scope of the officer's employment by the city. If the City Council desires, the city may reimburse officers for the base rate of this coverage but officers must be responsible for any additional costs due to personal or claims history. The city may not indemnify police officers against liability in any amount greater than required by State Statute unless the officer's insurance is exhausted. This amendment shall take effect one year after passage.

Before the Minneapolis City Council considered the proposed insurance amendment, the City Attorney concluded that the proposed amendment "is preempted by state law and conflicts with state public policy." Relying on provisions in Minn. Stat. ch. 466 (2016), which impose obligations on municipalities to defend and indemnify an employee acting within the scope of the employee's job duties, and Minn. Stat. § 471.44 (2016), which imposes a similar requirement on municipalities that is specific, among others, to police officers, the City Attorney concluded that the proposed insurance amendment "is not a legally appropriate charter amendment and the City Council should decline to place [it] on the ballot."[1] On August 5, 2016, the City Council voted not to include the proposed insurance amendment question on the ballot for the November 2016 election.

That same day, Bicking filed a petition under Minn. Stat. § 204B.44 in Hennepin County District Court. In his petition, Bicking asserted that requiring City police officers "to obtain their own insurance does not forbid" the City from "defending and indemnifying [those officers] so long as the employee was acting within the scope of his or her job duties and was not guilty of malfeasance, willful neglect of duty, or bad faith." The City asked the district court to dismiss the petition, asserting that the proposed insurance amendment conflicts with state law.

On August 22, 2016, the district court dismissed the petition. The court first found a "strong argument for field preemption" with respect to "who shall be financially responsible for claims made against city police officers" because Minnesota Statutes chapter 466 "addresses municipal tort liability exhaustively." If not field preemption, the district court concluded that express preemption applies because Minn. Stat. § 466.11, which makes

---

1. The City Attorney also relied on a potential conflict with Minn. Stat. ch. 179A (2016), the Public Employment Labor Relations Act (PELRA), which imposes obligations on public employers to meet and negotiate with certain employees. We do not address a possible conflict with PELRA because we conclude that the district court correctly determined that the proposed insurance amendment conflicts with other provisions of state law.

the provisions of chapter 466 "exclusive of" home rule charter provisions "on the same subject," reflects a legislative "intent to occupy the field." Finally, finding that the proposed insurance amendment conflicts with several statutes that address indemnification and defense of municipal employees, the court concluded that conflict preemption "operates to void the proposed charter amendment."

On August 25, 2016, Bicking filed a notice of appeal with the court of appeals and at the same time, filed a petition for accelerated review with our court. Minn. R. Civ. App. P. 118 ("Any party may petition the Supreme Court for accelerated review of any case pending in the Court of Appeals. . . ."). We granted Bicking's petition for accelerated review.

On appeal, Bicking asserts that the district court erred in dismissing his petition because the plain language of the proposed insurance amendment reveals a meaning and intent with respect to police liability insurance coverage that are different from, yet consistent with, state law. The City urges us to affirm the district court, contending that state law preempts the proposed insurance amendment.

## I.

■ We begin by addressing whether we have jurisdiction to resolve this dispute. Bicking contends that, having obtained the required number of citizen signatures and following other procedural steps for a citizen-initiated charter amendment, the City's only authority was to approve the form of the question for the ballot. *See* Minn. Stat. § 410.12, subd. 4 (authorizing "[t]he form of the ballot" to be "fixed by the governing body"). The City argues that its authority is beyond ministerial. Specifically, the City argues that it is not required to undertake a futile election for the sake of a proposed charter amendment

that will never be part of the charter, regardless of the election, because the amendment is unconstitutional or contrary to state law. *See State ex rel. Andrews v. Beach*, 155 Minn. 33, 35, 191 N.W. 1012, 1013 (1923) ("A home rule charter and all amendments thereto must be in harmony with the Constitution and laws of this state.").

We have express statutory authority to resolve the dispute between the parties: whether the Minneapolis City Council properly directed the City Clerk not to place the proposed question on the ballot for the 2016 election. *See* Minn. Stat. § 204B.44(a)(1) (conferring authority on the judicial branch to correct any error or omission "in the placement . . . of . . . any question on any official ballot"). Bicking invoked section 204B.44 when he filed his petition in the district court, the parties agree that section 204B.44 confers judicial authority to review a ballot-question decision, and none of the parties before us have questioned our authority to act in this case. The dissent, however, contends we lack jurisdiction based on the advisory-opinion doctrine. We disagree.

■ We "require the presence of a justiciable controversy as essential to our exercise of jurisdiction." *Schowalter v. State*, 822 N.W.2d 292, 298 (Minn. 2012); *see also Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 617 (Minn. 2007) (explaining that a justiciable controversy exists when a claim presents "definite and concrete assertions of right that emanate from a legal source," "a genuine conflict in tangible interests between parties with adverse interests," and a controversy capable of "resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion"). Here, we have a dispute between adverse parties that claim a legal right to control the decision to place a proposed charter amendment before City

voters in the form of a ballot question. The parties' conflicting legal claims present a concrete, genuine, justiciable controversy regarding the City's authority to refuse to place a citizen-initiated proposed charter amendment on the ballot. And our precedent makes clear that we have judicial authority to resolve this controversy. *See Schowalter*, 822 N.W.2d at 299; *Minneapolis Fed'n of Men Teachers, Local 238 v. Bd. of Educ.*, 238 Minn. 154, 157-58, 56 N.W.2d 203, 205-06 (1952).

In *Schowalter*, the Legislature conferred original jurisdiction on our court to validate certain tobacco appropriation bonds. 822 N.W.2d at 298. The parties, the Commissioner of the Minnesota Department of Management and Budget and the State through the Attorney General, asked us to address two issues: whether issuance of the bonds would constitute "public debt" in contravention of Minn. Const. art. XI, §§ 4-5, and whether all steps necessary had been taken for the valid issuance of the bonds. *Schowalter*, 822 N.W.2d at 298. We concluded that we did not have authority to address the second question because the parties agreed that "all procedural steps necessary to issue the bonds" had been taken, and thus, there was no genuine conflict in tangible interests between the parties. *Id.* at 299. But, although the bonds had not been issued and the Commissioner had no obligation to issue the bonds even if validated, we concluded that the disagreement between the parties regarding the constitutional question presented a justiciable controversy. *Id.* at 299 & n.5.

Similarly, in *Minneapolis Federation of Men Teachers*, we found that a justiciable controversy existed regarding the impact of a proposed contract on tenured teachers, even though the contract had not ac-

tually been submitted to the teachers for signature and no tenured teachers had actually refused to sign the contract. 238 Minn. at 157-58, 56 N.W.2d at 205-06. We said that a justiciable controversy does not require "such an actual right of action in one party against the other as would justify a granting of consequential relief." *Id.* at 157, 56 N.W.2d at 205. Rather, what is required is "only a right on the part of the complainant to be relieved of an uncertainty and insecurity arising out of an actual controversy with respect to his rights, status, and other legal relations with an adversary," even though "the *status quo* between the parties has not yet been destroyed or impaired." *Id.* at 157, 56 N.W.2d at 205.

The dissent's view that the advisory-opinion doctrine prohibits us from resolving this genuine and concrete dispute cannot be squared with *Schowalter* or *Minneapolis Federation of Men Teachers*; the dissent does not demonstrate otherwise. The dissent, instead, turns to *In re Application of the Senate*, 10 Minn. 78, 10 Gil. 56 (1865). But that case does not support the dissent's position either. *In re Application of the Senate* involved a "resolution of the Senate requesting the Supreme Court to furnish the Senate with [its] opinion upon certain questions stated in the resolution." *Id.* at 80, 10 Gil. at 56. In the absence of any adverse parties, any concrete dispute, or any tangible legal interest, we correctly concluded that the action requested by the Senate was "neither a judicial act, nor is it to be performed in a judicial manner." *Id.* at 81, 10 Gil. at 58. Our exercise of jurisdiction here is completely consistent with the result in *In re Application of the Senate*, because here, unlike there, we have a tangible conflict over adverse parties' claimed legal rights.[2]

---

2. The dissent contends that we rely on adversity alone for our jurisdiction here. We do not.

The dissent also relies on *Winget v. Holm* to support its conclusion that we lack judicial power to resolve the controversy presented here. 187 Minn. 78, 81, 244 N.W. 331, 332 (1932). Again, the dissent misses the mark.[3] The dissent argues that under *Winget* our judicial power to review provisions pre-enactment is limited to "procedural" defects in, or the manifest unconstitutionality of, proposed charter amendments. Here, the dissent focuses on one word in our opinion in *Winget*: "form." *Id.* at 81, 244 N.W. at 332. In *Winget*, the plaintiff sought an order restraining the Secretary of State from submitting a proposed constitutional amendment to voters, alleging that the proposed amendment violated a provision in the constitution that required two separate amendments to be submitted to voters separately. *Id.* at 81, 244 N.W. at 332. Before reaching this question, we considered, and rejected, the precise argument the dissent makes here, that the judiciary cannot act until after an election on a proposed amendment. *Id.* at

81, 244 N.W. at 332 (explaining respondent's argument that "at no point before" the election on a proposed amendment "may the court interfere"). We concluded there was "no good reason" to require the "trouble and expense" of an election if a proposed constitutional amendment "be not proposed in the *form* demanded by the constitution." *Id.* at 81, 244 N.W. at 332 (emphasis added).

Nothing in *Winget* suggests that we used the word "form" to limit pre-enactment review of procedural defects, while prohibiting pre-enactment review of the "underlying validity" of a proposed ballot question.[4] In fact, to decide whether the proposed amendment in *Winget* was in the "form" required by the constitution, we considered "the object and purpose of the [amendment]," concluding that it was intended to "widen the field of taxation and as incidental thereto make the procedure more elastic than at present." *Id.* at 85-86, 244 N.W. at 334. If there was "no good reason" to require an election on a pro-

In addition to adversity, which the dissent concedes exists, the parties have presented a genuine conflict in tangible legal interests, namely their conflicting claims to the legal right to control whether a proposed charter amendment question appears on a ballot. This genuine controversy can be resolved by specific relief—declaring the City's authority to refuse to put this particular question on the ballot based on the specific language of the actual proposed question—so we do not have "a hypothetical state of facts." *Seiz v. Citizens Pure Ice Co.*, 207 Minn. 277, 281, 290 N.W. 802, 804 (1940).

3. *State ex rel. Young v. Brill*, which the dissent also cites in discussing the advisory-opinion doctrine, involved a challenge to a statute that required judges to appoint the board members to the Board of Control for Ramsey County. 100 Minn. 499, 501-02, 111 N.W. 639, 640 (1907). As we recognized, "the power to appoint a public office is in its nature an executive function." *Id.* at 525, 111 N.W. at 650. We resolved the justiciable controversy the case presented—whether the judges who

refused to make the appointments could be commanded to do so—by holding that the statute violated the separation of powers. *Id.* at 502, 111 N.W. at 640 (explaining the positions taken by the adverse parties regarding the statutory duty imposed). In reaching the separation-of-powers conclusion, we plainly exercised judicial power. *Brill*, therefore, also supports our exercise of judicial power here.

4. Similarly, nothing in *McConaughy v. Secretary of State*, 106 Minn. 392, 119 N.W. 408 (1909), adopts a procedural-defect limitation to our review. We examined decisions from other states showing that "courts have almost uniformly exercised the authority to determine the validity of the proposal, submission, or ratification of constitutional amendments." *Id.* at 401, 119 N.W. at 411. We also recognized that "every officer ... must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power ... of the judiciary." *Id.* at 416, 119 N.W. at 417.

posed amendment that was not in the "form" required by the constitution, *id.* at 81, 244 N.W. at 332, we know of "no good reason" to require an election on a proposed amendment that is in clear conflict with the constitution or the laws of the state. *See Andrews,* 155 Minn. at 35, 191 N.W. at 1013 ("A home rule charter and all amendments thereto must be in harmony with the Constitution and laws of this state."). Thus, we have consistently applied *Winget* to ensure that municipal officials are not required to undertake "what would amount to a futile election and a total waste of taxpayers' money." *Davies v. City of Minneapolis,* 316 N.W.2d 498, 504 (Minn. 1982); *see also Vasseur v. City of Minneapolis,* 887 N.W.2d 467, 472 (Minn. 2016) (affirming the City's decision to refuse to place a question on the ballot and noting that "we have declined to require the futile gesture of placing an unconstitutional or unlawful proposed charter amendment on the ballot"); *Minneapolis Term Limits Coal. v. Keefe,* 535 N.W.2d 306, 308 (Minn. 1995) ("[W]hen a proposed charter amendment is manifestly unconstitutional, the city council may refuse to place the proposal on the ballot."); *Hous. & Redevelopment Auth. v. City of Minneapolis,* 293 Minn. 227, 234, 198 N.W.2d 531, 536 (1972) (holding that the district court properly enjoined an election on a proposed charter amendment "rather than permit the administration and the voters

of the city of Minneapolis to experience the frustration and expense of setting up election machinery and going to the polls in a process which was ultimately destined to be futile").

Unable to find support in Minnesota precedent, the dissent looks to other states. But the express limits on the initiative rights of Minneapolis residents stand in stark contrast to the constitutional and statutory right of initiative held by citizens in other states. For example, Arizona citizens reserved in their state constitution the "power to create legislation through initiative." *Winkle v. City of Tucson,* 190 Ariz. 413, 949 P.2d 502, 504 (1997) (citing Ariz. Const. art. IV, pt. 1, § 1). As "Arizona citizens are not precluded from legislating on any issue, even though the legislation might conflict with the Arizona Constitution or state law," Arizona courts will not conduct a pre-enactment review of a proposed ballot question. *Id.* In Oklahoma, citizens hold the statutory right to "initiate at the polls, any legislation they deem advisable," *In re Initiative Petition No. 360,* 879 P.2d 810, 812 (Okla. 1994) (citing Okla. Stat. tit. 34, § 8).[5] We do not have such expansive initiative rights in Minnesota. Accordingly, decisions from other states that refrain from resolving a justiciable controversy out of deference to citizen-initiative rights are not persuasive here.[6]

---

5. Similarly, the Nebraska Supreme Court relied on the "precious" right of citizen initiatives, which "the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter." *Stewart v. Advanced Gaming Techs., Inc.,* 272 Neb. 471, 723 N.W.2d 65, 77 (2006). As noted earlier, neither the Minnesota Constitution nor the Minneapolis City Charter confers a similar depth of initiative right on City residents. Thus, the "chilling effect" the dissent perceives in our consideration of the City's right to refuse to place a citizen initiative on the ballot is misplaced.

6. There are, however, examples from other states similar to the dispute presented here and those examples confirm our jurisdiction. For example, the Washington Supreme Court acknowledges that pre-election review of "the subject matter of the measure" is permitted when the parties' dispute "address[es] the more limited powers of initiatives under city or county charters." *Coppernoll v. Reed,* 155 Wash.2d 290, 119 P.3d 318, 322 (2005). That court has addressed a pre-election challenge to the substance of a proposed citizen initiative, noting that municipal residents "cannot enact legislation which conflicts with state

Finally, we reject the dissent's suggestion that we overrule our longstanding precedent by holding that a controversy such as this one, involving the "frustration and expense" of a futile election, is justiciable. *Hous. & Redevelopment Auth.*, 293 Minn. at 234, 198 N.W.2d at 536. This precedent has stood the test of time over almost 100 years, and the dissent's apparent disagreement with our precedent does not provide a reason for us to discard it.

In sum, given the concrete, genuine, adversarial dispute before us, we conclude that the parties' contest over Bicking's right to place a proposed charter amendment question on the ballot is justiciable. This conclusion is consistent with our doctrine of stare decisis, our obligation to promote stability in the law and the integrity of the judicial process, and our reluctance to overrule our precedent absent a "compelling reason," *State v. Martin*, 773 N.W.2d 89, 98 (Minn. 2009) (citation omitted) (internal quotation marks omitted), as well as our statutory authority, Minn. Stat. § 204B.44.

## II.

▇▇▇ Next, we consider the merits of the parties' dispute. Preemption of municipal ordinances by state law is a legal question subject to de novo review. *State v.*

*Kuhlman*, 729 N.W.2d 577, 580 (Minn. 2007); *City of Morris v. Sax Invs., Inc.*, 749 N.W.2d 1, 5 (Minn. 2008) ("The application of statutes, administrative regulations, and local ordinances to undisputed facts is a legal conclusion and is reviewed de novo.").[7]

▇▇▇ We have said that charter provisions (and therefore charter amendments) must be consistent with state law and state public policy. *See State ex rel. Lowell v. Crookston*, 252 Minn. 526, 528, 91 N.W.2d 81, 83 (1958) ("The adoption of any charter provision contrary to the public policy of the state, as disclosed by general laws or its penal code, is also forbidden."); *St. Paul Citizens for Human Rights v. City Council*, 289 N.W.2d 402, 405 (Minn. 1979) ("A municipal ordinance will be upheld unless it is inconsistent with the Federal or State Constitution or state statute."). This is so because municipalities "'have no inherent powers'" and can enact regulations only as "'expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred.'" *Kuhlman*, 729 N.W.2d at 580 (quoting *Mangold Midwest Co. v. Vill. of Richfield*, 274 Minn. 347, 357, 143 N.W.2d 813, 820 (1966)). In other words, "state law may limit the power of a city to act in a particular area." *City of Morris*, 749 N.W.2d at 6.

---

law." *Seattle Bldg. & Constr. Trades Council v. City of Seattle*, 94 Wash.2d 740, 620 P.2d 82, 86 (1980). In addition, when the dispute involves the scope of citizen initiative rights, as does this case, courts recognize that challenges asserting "that the subject matter is not proper for direct legislation, are usually considered." *Herbst Gaming, Inc. v. Heller*, 122 Nev. 877, 141 P.3d 1224, 1228 (2006). In *Herbst*, the Nevada Supreme Court invoked the advisory-opinion doctrine only regarding the application of the proposed initiative to hotel and motel rooms, a question as to which "no actual controversy was presented." *Id.* at 1232 n.36.

7. Bicking explains that the proposed insurance amendment seeks to address "the incorrigible and longstanding problem" of police misconduct by "applying the proven risk management strategy of professional liability insurance." Such policy arguments are not relevant to our analysis. *See Kuhlman*, 729 N.W.2d at 584 (explaining that the "compelling public safety considerations" that led to adoption of an ordinance governing red-light violations "are not relevant to a preemption analysis"); *City of Morris*, 749 N.W.2d at 13 ("[R]egardless of our view on the merits of [the municipality's] policy arguments, we are bound to apply the policy decisions adopted by the Legislature. . . .").

And we have recognized that placing an unconstitutional or unlawful proposed amendment on the ballot is a futile gesture that we do not require. *Hous. & Redevelopment Auth. v. City of Minneapolis*, 293 Minn. at 234, 198 N.W.2d at 536 (holding that the district court properly enjoined an election on a proposed amendment to a city charter "rather than permit the administration and the voters of the city of Minneapolis to experience the frustration and expense of setting up election machinery and going to the polls in a process which was ultimately destined to be futile"); *Andrews*, 155 Minn. at 35, 191 N.W. at 1013. The question we must decide in this case is whether state law conflicts with or otherwise preempts the proposed insurance amendment. If it does, the amendment cannot be included in the City Charter.

■■ We turn first to the question of conflict preemption. A municipality "cannot enact a local regulation that conflicts with state law" or enact a regulation when state law "fully occup[ies] a particular field of legislation." *City of Morris*, 749 N.W.2d at 6 (citations omitted) (internal quotation marks omitted).[8] A conflict exists between state law and a municipal regulation when the law and the regulation "contain express or implied terms that are irreconcilable with each other," when "the ordinance permits what the statute forbids," or when "the ordinance forbids what the statute *expressly* permits." *Mangold Midwest Co.*, 274 Minn. at 352, 143 N.W.2d at 816; *see also City of Duluth v. Cerveny*, 218 Minn. 511, 520-21, 16 N.W.2d 779, 785 (1944) (finding no conflict between a state statute and a municipal ordinance that each regulated the forfeiture of seized liquor where the "difference in detail in the execution of the forfeiture provisions . . : preserve[d] the standard of regulation as moulded by" the statute (citation omitted) (internal quotation marks omitted)); *Bruce v. Ryan*, 138 Minn. 264, 266, 164 N.W. 982, 982 (1917) (finding no conflict between a state statute that regulated the use and speed of vehicles and a municipal ordinance that gave the right of way to vehicles at certain intersections in the city because "the statute established no rule which applies to the situation provided for by the ordinance").

---

**8.** The district court considered field preemption, express preemption, and conflict preemption, *see In re Gillette Children's Specialty Healthcare*, 883 N.W.2d 778, 785 (Minn. 2016) (explaining that preemption may be found " 'by express provision, by implication, or by a conflict' " with other laws (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995))). When the question is whether state law preempts a municipal regulation, we have considered whether the Legislature has comprehensively addressed the subject matter such that state law now occupies the field, *see City of Minnetonka v. Mark Z. Jones Assocs., Inc.*, 306 Minn. 217, 220, 236 N.W.2d 163, 165 (1975) (explaining that the State Building Code "has dealt with fire prevention in a comprehensive manner" that reflected "the legislature's intent that the state code preempt the requirements for fire prevention"); *Man-*

*gold Midwest Co.*, 274 Minn. at 356, 143 N.W.2d at 819 (explaining preemption as "the 'occupation of the field' concept"); whether "the legislature expressly declare[d] that [state] law shall prevail" over municipal regulation, *Am. Elec. Co. v. City of Waseca*, 102 Minn. 329, 334, 113 N.W. 899, 901 (1907); or whether a municipal regulation conflicts with state law, *City of Morris*, 749 N.W.2d at 6 ("[A] city cannot enact a local regulation that conflicts with state law . . . ."); *Duffy v. Martin*, 265 Minn. 248, 255, 121 N.W.2d 343, 348 (1963) (finding a conflict between a state statute and a municipal ordinance that each regulated the movement of a parked car because the "ordinance add[ed] the requirement absent from the statute"). Because we conclude that the proposed insurance amendment conflicts with Minnesota state law, we do not address the field and express preemption determinations that the district court made.

The district court identified the following conflicts between state law and the proposed insurance amendment. First, the district court concluded that state law requires municipalities to defend and indemnify employees acting in the scope of their job duties, including for punitive damages, but the proposed insurance amendment, by making the police officer's insurance the "primary," or the first, coverage for purposes of any recovery, would ensure that the claimant looks first to the officer's primary insurance for any recovery. Second, the district court recognized that municipalities may purchase insurance in excess of the liability limits established by state law, but the proposed insurance amendment would prohibit the City from indemnifying officers in an amount "greater than required by State Statute" unless the officer's primary insurance is exhausted. Third, the district court concluded that state law requires municipalities to furnish legal counsel to police officers and pay the reasonable costs and expenses of defense, but the proposed insurance amendment, by making the officer's insurance the primary coverage, would place the burden of defense on the officer.

Bicking argues that the district court found conflicts where none exist because the proposed insurance amendment focuses on an area not addressed by state law—insurance coverage for acts that are willful, malicious, or outside the scope of an officer's employment. Bicking further argues that state law does not require municipalities to pay for insurance purchased by public employees, nor does it prohibit a municipality from deciding to provide a defense for an officer accused of willful, malicious, or other bad-faith acts. Thus, Bicking concludes, the proposed insurance amendment is "merely additional and complementary to or in aid and furtherance of" state law rather than in conflict with state law because the proposed amendment

"covers specifically what the statute covers generally." *Kuhlman*, 729 N.W.2d at 580-81 (citations omitted) (internal quotation marks omitted). We disagree.

Under Minn. Stat. § 466.02, "every municipality," including a home rule charter city such as Minneapolis, "is subject to liability for" the torts of its "officers, employees and agents acting within the scope of their employment or duties." *See* Minn. Stat. § 466.01, subd. 1 (including a "home rule charter" within the definition of "municipality"). In addition, a municipality "shall defend and indemnify any of its officers and employees ... for damages, including punitive damages" claimed against the employee. Minn. Stat. § 466.07, subd. 1. By requiring City police officers to carry insurance that serves as the "primary" coverage for personal liability, the proposed insurance amendment "adds a requirement that is absent from the statute," *Kuhlman*, 729 N.W.2d at 583 (citation omitted) (internal quotation marks omitted). Specifically, the proposed insurance amendment would place the officer's personal coverage ahead of the City's mandatory defense and indemnification obligation. *See Auto Owners Ins. Co. v. Northstar Mut. Ins. Co.*, 281 N.W.2d 700, 703 (Minn. 1979) ("[I]f one insurer is primarily liable and the other only secondarily, the primary insurer must pay up to its limit of liability, and then the secondary insurer must pay for any excess up to its own limit of liability." (citation omitted) (internal quotation marks omitted)).

Moreover, state law allows a municipality to secure insurance coverage for "punitive damages," for torts committed by its employees "for which the municipality is [otherwise] immune from liability," and for coverage of the municipality's liability "in excess of the liability imposed" by law. Minn. Stat. § 466.06. Yet the proposed insurance amendment would forbid the

City from indemnifying an officer "against liability in any amount greater than required by State Statute unless the officer's insurance is exhausted." When considered against the plain language of section 466.06, it is clear that the proposed amendment would forbid what the statute permits. *See City of Morris*, 749 N.W.2d at 11 (concluding that an ordinance that required the use of ground fault interrupter receptacles in existing buildings was invalid under the State Building Code, which "permits the continued use of an existing residential structure without the installation of these devices").

But, Bicking contends, the proposed amendment "does not preclude" the City from procuring insurance if it chooses to do so. Bicking is correct to the extent that his argument rests on the permissive language of Minn. Stat. § 466.06 (stating that a municipality *"may* procure insurance" (emphasis added)); *see* Minn. Stat. § 645.44, subd. 15 (2016) (" 'May' is permissive."). Minnesota Statutes § 466.11, however, states that the provisions of chapter 466 "are exclusive of and supersede all home rule charter provisions and special laws on the same subject heretofore and hereafter adopted." Given that the proposed insurance amendment would expressly prohibit what chapter 466 permits the City to do—procure additional insurance coverage, even for conduct for which the City would not otherwise be liable—we cannot conclude that the proposed insurance amendment is "in harmony with" state law. *Power v. Nordstrom*, 150 Minn. 228, 232, 184 N.W. 967, 969 (1921).

Finally, we consider Bicking's argument that the "City can continue to defend officers whenever it opts to do so." The City's obligation to defend its police officers is not as permissive as Bicking suggests. Under state law, every municipality "shall ... furnish legal counsel to defend" a police officer and "pay the reasonable costs and expenses of defending" the officer, "notwithstanding any contrary provisions in ... the charter of" the municipality. Minn. Stat. § 471.44, subd. 1. We construe statutes according to the plain and ordinary meaning of the language used. *State v. Rick*, 835 N.W.2d 478, 483 (Minn. 2013). Bicking's suggestion that the proposed insurance amendment would not interfere with the City's defense obligations fails to appreciate the mandatory nature of the City's obligation under section 471.44: it "shall" furnish legal counsel and "shall" pay defense costs. *See* Minn. Stat. § 645.44, subd. 16 (2016) (" 'Shall' is mandatory."). We cannot reconcile the designation of the officer's insurance as the "primary" coverage under the proposed insurance amendment with the mandatory obligations imposed by Minn. Stat. § 471.44, subd. 1.

In sum, the proposed insurance amendment would add requirements that are absent from chapter 466, such as designating the officer's required coverage as "primary"; would include provisions that permit what state law forbids, such as relieving the City of its liability for torts committed in the scope of the officer's employment until the officer's insurance coverage is first "exhausted"; and would include provisions that forbid what state law expressly permits, such as purchasing insurance coverage for acts for which the City would otherwise be immune.

For the foregoing reasons, we affirm the decision of the district court that dismissed Bicking's petition under Minn. Stat. § 204B.44.

Affirmed.

MCKEIG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

## DISSENT

STRAS, Justice (dissenting).

In an alleged effort to improve policing and police accountability within the City of Minneapolis, a group of citizens sought to include a proposed amendment to Minneapolis's City Charter on the general-election ballot. The amendment would have required police officers to, among other things, procure professional-liability insurance. Even though the group satisfied all of the procedural requirements for placement of the question on the general-election ballot, the Minneapolis City Council struck the question based on an opinion by the City Attorney that the proposed amendment would, *if passed*, be "preempted by state law and conflict[ ] with state public policy." The citizen group challenged the City Council's decision in Hennepin County District Court, seeking a ruling requiring the question to be placed on the ballot. The district court dismissed the petition, concluding that the proposed amendment was preempted by state statute. In my view, the district court properly dismissed the citizen group's petition, but it did so for the wrong reason. Instead of addressing the petition on the merits, as the district court did, I would conclude that this dispute is nonjusticiable.[1]

The citizen group's petition called for nothing more than a classic advisory opinion because, prior to the election, the city-charter amendment was not the law. It was the citizen-initiative equivalent of a bill winding its way through the legislative process. It had the potential to become law, to be sure, but until it garnered the necessary votes, it was nothing more than an idea. We do not give advice to the

Legislature when a bill is being considered for passage—an uncontroversial proposition that traces back to the nation's founding—nor can we give advice to a citizen group or a city council on whether a *proposed* law will violate the Minnesota Constitution or a state statute. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410, 1 L.Ed. 436 (1792). This is a task that we may undertake only after a proposal actually becomes law and once we are presented with a case or controversy involving adverse parties. Just as we are not a junior-varsity legislature, neither are we the legal counsel or the research division of the Minneapolis City Council. *In re Guardianship of Tschumy*, 853 N.W.2d 728, 756 (Minn. 2014) (Stras, J., dissenting).

The prohibition on the issuance of advisory opinions traces back to 1792, when the Supreme Court of the United States decided *Hayburn's Case*. In *Hayburn's Case*, a circuit court, and later the Supreme Court, were asked to decide whether William Hayburn, a war veteran, was entitled to disabled-veteran benefits. 2 U.S. (2 Dall.) at 409. The federal statute under which the parties proceeded contained what we would now view as an odd provision: it required a court to decide whether, in its view, a particular claimant's family should receive benefits, but the decision was only advisory to the Secretary of War, who would make the final determination of eligibility. *Id.* at 410. One circuit-court decision, which was discussed extensively by the Supreme Court, said that "the business assigned to this court, by the act, is not judicial, nor directed to be performed judicially." *Id.* Citing another circuit-court decision, *Hayburn's Case* fur-

---

1. Although the City Council's decision remains in place under my approach, which appears at first glance to be the same as the result reached by the court, the court would *affirm* the district court's decision, whereas I would *vacate* the district court's decision. The differing dispositions mean that my separate writing is a dissent rather than a concurrence.

ther categorically stated that "the business directed by this act [was] not of a judicial nature." *Id.* at 411. Although the Court never actually decided that the statute was unconstitutional, five of the six justices, each of whom considered the question while riding circuit, had concluded that the non-binding, advisory nature of the decision was inconsistent with the exercise of judicial power. *See id.* at 410-13; *see also North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) ("Early in its history, this Court held that it had no power to issue advisory opinions." (citing *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792))).

Our advisory-opinion doctrine, built from cases like *Hayburn's Case*, requires us to decline to answer legal questions until we are presented with a concrete case or controversy. *See In re Application of the Senate*, 10 Minn. 78, 81, 10 Gil. 56, 57-58 (1865); *see also Lee v. Delmont*, 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949) ("Issues which have no existence other than in the realm of future possibility are purely hypothetical and are not justiciable."). To do otherwise would exceed the scope of "judicial power" in Article VI, Section 1, of the Minnesota Constitution by making us "advisers of the legislature, nothing more." *In re Application of the Senate*, 10 Minn. at 81, 10 Gil. at 58. We have consistently adhered to the lesson of *Hayburn's Case*, including discussing it in our very first decision on the advisory-opinion doctrine, *In re Application of the Senate*, which we decided in 1865, less than 7 years after Minnesota became a state. 10 Minn. at 81, 10 Gil. at 57-58; *see also State ex rel. Young v. Brill*, 100 Minn. 499, 521, 111 N.W. 639, 648 (1907) ("[A] statute which authorized either branch of the legislature to call for the opinion of the supreme court, or any one of the judges thereof, was held unconstitutional.").

The court relies on a single statute, Minn. Stat. § 204B.44(a)(1) (2016), to conclude that the district court had jurisdiction over the citizen group's petition. The court's analysis is, at best, partially complete. It is true that section 204B.44(a) provides *statutory* authority for the district court's actions, but subject-matter jurisdiction requires more. *See Zweber v. Credit River Twp.*, 882 N.W.2d 605, 608 (Minn. 2016). What is missing here is the *constitutional* authority to decide the case, and in particular, the presence of a concrete case or controversy. *See Schowalter v. State*, 822 N.W.2d 292, 298 (Minn. 2012). When the citizen group filed its petition in August with the district court, its request presented nothing more than a hypothetical question about the possible legal difficulties facing a city-charter amendment that had not yet passed. The petition therefore failed the first requirement for a justiciable controversy: it did not present "'definite and concrete assertions of right that emanate[d] from a *legal* source.'" *Schowalter*, 822 N.W.2d at 298-99 (emphasis added) (quoting *Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 617 (Minn. 2007)). As we noted in *Schowalter*, it makes no difference whether a statute gives us the authority to decide a dispute if constitutional authority is absent. *Id.* at 298 ("By virtue of this *statute,* we have original jurisdiction in this matter. *But we do not issue advisory opinions* and we do not 'decide cases merely to establish precedent.'" (emphasis added) (citations omitted)).

It is true that some of our case law beginning in the 1930s purports to allow us to determine the legality of a ballot initiative in advance, but these cases cannot be squared with our longstanding jurisprudence prohibiting courts from issuing advisory opinions. This leaves us with two possible choices: either adhere to the prohibition on advisory opinions that traces

back to our nation's (and state's) founding or follow a line of more contemporary cases that appears to give courts the authority to decide hypothetical ballot questions. I choose the former path because it is the only one that is consistent with the Minnesota Constitution.

Even so, it is not clear, despite the court's assertion to the contrary, that our cases *really* require us to choose between these two seemingly distinct paths. Our preenactment-review cases begin with *Winget v. Holm*, 187 Minn. 78, 244 N.W. 331 (1932). In *Winget*, a citizen sought to restrain the Secretary of State from placing a proposed constitutional amendment on the general-election ballot. *Id.* at 81, 244 N.W. at 332. We held that a court should have the authority to "interpose to save the trouble and expense of submitting a proposed constitutional amendment to a vote, if it be not proposed in the *form* demanded by the constitution, so that, though approved by the electors, the courts would be compelled to declare it no part of the constitution." *Id.* at 81, 244 N.W. at 332 (emphasis added). Importantly, *Winget* dealt only with a *procedural* defect in the proposed constitutional amendment, not its underlying validity. The objection to the proposed constitutional amendment was its lack of compliance with then-Article XIV, Section 1, of the Minnesota Constitution, which required that, when two or more amendments were submitted to the voters at the same time,

the voters be allowed to vote on the amendments separately. This procedural defect, which was distinct from the amendment's underlying validity, was the only challenge that we considered in *Winget*.[2] *See also State ex rel. Andrews v. Beach*, 155 Minn. 33, 35, 191 N.W. 1012, 1013 (1923). ("We do not hold that an amendment to a charter must be submitted even though it is manifestly unconstitutional. That question is not now before us and consideration is not necessary to the determination of this appeal."); *McConaughy v. Sec'y of State*, 106 Minn. 392, 401, 119 N.W. 408, 411 (1909) (listing examples of courts exercising authority in such cases, all of which involved procedural defects).

We have therefore held, quite correctly in my view, that courts have the constitutional authority to strike questions from the ballot when the party sponsoring the initiative has failed to follow the procedural requirements for placing it on the ballot. *E.g.*, *Winget*, 187 Minn. at 81, 244 N.W. at 332. This line of cases makes sense because evaluating whether a party has followed the procedures for placing a question on the ballot does not require a court to prejudge the question's legality. There is less authority, however, for the remarkable proposition adopted by the court in this case, which is that a court can prejudge the legality of a proposed initiative that may never become law.

In support of its license to strike the proposed city-charter amendment in this

**2.** The court says that nothing in *Winget* suggested that our statement about the "form" of a proposed amendment meant that only procedural, rather than substantive, review can occur prior to enactment. For support, the court seizes on the fact that we also mentioned the "object and purpose of [the amendment]" in *Winget*. However, the court omits perhaps the most important fact about *Winget*: when we referred to the "object and purpose of [the amendment]," it was only to determine whether the amendment complied with the *procedural* requirement of Article XIV, Section 1, to have the voters consider separate amendments independently, not to determine the amendment's underlying substantive validity. *Winget*, 187 Minn. at 85-86, 244 N.W. at 334. In fact, *Winget* involved *only* a procedural defect, bolstering the conclusion that *Winget* was all about ensuring that the amendment satisfied the procedural requirements for placement on the ballot, not about allowing courts to serve as the preenactment gatekeepers for constitutional amendments.

case, the court relies on several post-*Winget* cases, but each of these cases requires the satisfaction of a condition that is conspicuously absent from this case: manifest and obvious unconstitutionality. *See Minneapolis Term Limits Coal. v. Keefe*, 535 N.W.2d 306, 308 (Minn. 1995); *Hous. & Redevelopment Auth. v. City of Minneapolis*, 293 Minn. 227, 234, 198 N.W.2d 531, 536 (1972). The court nowhere holds— nor can it given the nature of the challenge in this case—that the proposed amendment is manifestly unconstitutional. In fact, adjudicating the challenge in this case is particularly troubling precisely because it takes us a step beyond deferentially reviewing proposed legislation for manifest and obvious constitutional invalidity. It requires us to interpret a state statute—one that we have never considered before— and give it a definitive interpretation in light of a proposed city-charter amendment that does not, and may never, carry the force of law. Such review manages to at the same time undermine the limits on judicial power in the Minnesota Constitution and place the judiciary in the unfamiliar role of gatekeeper of local citizen initiatives and referenda. *See* Minn. Const. art. XII, § 5.[3]

The court nevertheless insists that its conclusion is the only one supported by stare decisis, and that I advocate overruling "our longstanding precedent" that has "stood the test of time over almost 100 years." Nothing could be further from the truth. First, the court makes only a half-hearted attempt to explain why the action it takes today does not require an advisory opinion, which is a departure from even older and more longstanding precedent. Second, even if I were to accept that *Housing & Redevelopment Authority* and *Keefe* permit substantive preenactment review despite the advisory-opinion doctrine (which neither opinion addresses), those two cases *still* do not provide authority for the court's opinion today. Rather, these cases only permit courts to preemptively strike questions from the ballot after finding manifest unconstitutionality, a conclusion that is nowhere to be found in today's majority opinion.[4] Given that the court to-

3. In addition, the court's robust judicial review of citizen initiatives will undermine democracy by having a chilling effect on such measures, because its arguments apply to *all* initiatives, not just those proposed under Article XII, Section 5. The court, in effect, makes us a super city council, requiring us to decide which initiatives should be placed on the ballot. This is a determination that should be made by the legislative branches: either the Legislature itself, or a city council operating in a legislative capacity.

4. The court suggests that my position "cannot be squared with" *Schowalter* and *Minneapolis Federation of Men Teachers, Local 238 v. Board of Education*, 238 Minn. 154, 56 N.W.2d 203 (1952). The court is wrong. One misconception permeating the court's analysis is its near-myopic focus on the presence of adversity in this case, which suggests that it believes that adversity—just one of the three requirements of the advisory-opinion doctrine—is sufficient for a justiciable controversy. *See, e.g., Schowalter*, 822 N.W.2d at 299 (focusing on the adversity requirement of the advisory-opinion doctrine). Even the one case that marginally supports the court's position by discussing one of the other advisory-opinion-doctrine requirements, *Minneapolis Federation of Men Teachers*, involved a situation in which the hypothetical nature of the controversy was a product of judicial intervention— specifically, the grant of an injunction—not a case like this one involving a dispute that was inherently hypothetical from the very beginning. 238 Minn. at 157, 56 N.W.2d at 206. Our cases, again dating back to *In re Application of the Senate*, make clear that a case must satisfy all three requirements, not just one, to be justiciable.

An example illustrates the court's error. Suppose that two parties took adverse positions under the Senate resolution at issue in *In re Application of the Senate*, arguing that a *proposed* bill that would impose land-use regulations violates the Minnesota Constitution. On one side of the dispute is a group of

day ignores the limits on substantive pre-enactment review from *Housing & Redevelopment Authority* and *Keefe*, the court's argument is really a form of *faux* stare decisis: it looks real at first, but when you peel back the layers, the only reasonable conclusion is that it is not.

The fact that the court's rule in this case is inconsistent with the Minnesota Constitution and a close reading of our cases is alone sufficient to cast doubt on the court's decision. But in addition, most jurisdictions that allow preenactment review limit it to procedural defects and have rejected invitations to expand it to encompass other types of challenges. *See, e.g., Winkle v. City of Tucson*, 190 Ariz. 413, 949 P.2d 502, 505 (1997) (" '[I]t is only in cases where the initiative petition is *defective in form … where the procedure prescribed has not been followed* that the court has authority to intervene and enjoin its enactment.' " (quoting *Williams v. Parrack*, 83 Ariz. 227, 319 P.2d 989, 991 (1957))); *Stewart v. Advanced Gaming Techs., Inc.*, 272 Neb. 471, 723 N.W.2d 65, 76 (2006) ("We have thus made a distinction between *substantive* constitutional challenges to an initiative which do not become justiciable until the proposal is approved by voters and *procedural* challenges to the legal sufficiency of an initiative petition which may be determined prior to an election." (emphasis added)); *Herbst Gaming, Inc. v. Heller*, 122 Nev. 877, 141 P.3d 1224, 1228-31 (2006) (permitting preelection challenges "based on asserted procedural defects," but refusing to consider challenges "that the measure, if enacted, would vio-late substantive federal or state constitutional provisions"); *Foster v. Clark*, 309 Or. 464, 790 P.2d 1, 5 (1990) (stating that courts have jurisdiction to consider whether a proposed initiative is procedurally authorized to be placed on the ballot, but not to consider "general questions of constitutionality, such as whether the proposed measure, if enacted, would violate some completely different portion of the constitution"); *Coppernoll v. Reed*, 155 Wash.2d 290, 119 P.3d 318, 321-22 (2005) (permitting challenges to "a ballot measure's noncompliance with procedural requirements," but not those objecting to its substantive validity). And even those jurisdictions that allow substantive preenactment review limit the inquiry to whether a proposed law is manifestly or clearly unconstitutional, a far different inquiry than the court engages in here. *See, e.g., Hessey v. Burden*, 615 A.2d 562, 574 (D.C. 1992) ("We agree with the majority of courts which hold that [preenactment] review is imprudent. But there may be extreme cases in which it would be both appropriate and efficient to decide the constitutionality of a proposed initiative."); *In re Initiative Petition No. 360*, 879 P.2d 810, 814 (Okla. 1994) ("[W]e have limited such pre-election review to clear or manifest facial constitutional infirmities. …").

Our premature consideration of this case also artificially circumscribes our own review. Ordinarily, courts have the authority to sever unconstitutional portions of a statute or ordinance and allow the remaining, constitutional provisions to continue

---

homeowners and on the other side is a municipality. The mere presence of adverse parties would no more permit us to decide such a hypothetical controversy than the case before us now. The reason is not the absence of adversity, which I concede is present here, but rather the fact that it would require us to adjudicate a controversy without a "definite and concrete assertion[ ] of [a] right that ema-nate[s] from a *legal source*" and one that is incapable of "resolution by judgment rather than presenting *hypothetical facts* that would form an advisory opinion." *Onvoy, Inc.*, 736 N.W.2d at 617-18 (emphasis added). The advisory-opinion doctrine is not, and never has been, a balancing test. Rather, it is a fundamental constraint on our exercise of judicial power under the Minnesota Constitution.

in effect. Minn. Stat. § 645.20 (2016). This is particularly true in cases involving preemption. *See, e.g., Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 432 (1st Cir. 2016); *Cellco P'ship v. Hatch*, 431 F.3d 1077, 1083 (8th Cir. 2005). Yet by striking the city-charter amendment before it is enacted, we have foreclosed the possibility of severance. It would be improper and impracticable to sever portions of a proposed city-charter amendment before it even becomes law. The unavailability of severance, a traditional remedy, provides additional evidence that preenactment review is inconsistent with the notion of judicial power.

The court repeatedly justifies its approach based on its concerns about futility, asserting that it is our job to prevent voters from undertaking a "futile" election on a ballot initiative that would be invalid if passed. But that, in fact, is not our job. It is equally futile to ask legislators to vote on proposed bills that are likely preempted by federal law or unconstitutional, and I do not understand the court to be suggesting that we have the power to give advice to the Legislature before it votes on proposed legislation. This case is no different.

No matter the policy considerations involved, we simply cannot exercise judicial authority that we do not have. Nowhere does the court cast doubt on the central claim that we are not empowered to prejudge the validity of proposals before they become law. *Hayburn's Case* and *In re Application of the Senate* remind us that constitutional limits are not a matter of convenience or preventing futility, but rather are fundamental constraints on our authority that preserve the separation of powers, a principle itself enshrined in the Minnesota Constitution. *See* Minn. Const. art. III, § 1. Because I would conclude that the question posed by this case is nonjusticiable, I would vacate the district court's order and dismiss the petition.

I respectfully dissent.