BJORKMAN, Judge
These related appeals concern a City of Minneapolis ordinance that requires employers to provide sick-and-safe leave. Respondents Minnesota Chamber of Commerce, et al. (the chamber) contend that state law conflicts with and impliedly preempts the ordinance. Appellant City of Minneapolis challenges the district court's ruling that application of the ordinance to employers located outside the city violates the extraterritoriality doctrine. We affirm the district court's determination that state law does not preempt the ordinance. But because we conclude that the ordinance does not have extraterritorial operation, we reverse in part, vacating the permanent injunction against the city enforcing the ordinance against employers located outside of the city.
FACTS
On May 31, 2016, the city enacted the sick-and-safe-leave ordinance (ordinance), Minneapolis, Minn., Code of Ordinances (MCO) §§ 40.10-.310 (2017), in order "to safeguard the public welfare, health, safety *761 and prosperity of the people of ... the City." MCO § 40.30(e). The ordinance generally defines an employee as "any individual employed by an employer ... who perform[s] work within the geographic boundaries of the City for at least eighty (80) hours in a year" (80-hour threshold). MCO § 40.40. The ordinance defines an employer as "a person or entity that employs one (1) or more employees." Id.[1]
The key provisions of the ordinance require employers to provide employees "one (1) hour of sick and safe time for every thirty (30) hours worked up to a maximum of forty-eight (48) hours in a ... year." MCO § 40.210(a). The leave must be paid unless the employer has five or fewer employees. MCO § 40.220(g)-(h). Leave may be used for the employee's or a family member's needs related to health, domestic abuse, sexual assault, stalking, and school, daycare, and workplace closings. MCO § 40.220(b)(1)-(6). The ordinance requires employers to track the accrual and use of leave time. MCO § 40.270. The ordinance was to take effect on July 1, 2017, with limited enforcement during the first year. MCO § 40.90.
In October 2016, the chamber initiated this action, seeking declaratory relief and a temporary injunction prohibiting the city from enforcing the ordinance. The district court granted the chamber partial temporary relief, concluding that the chamber was unlikely to prevail on its preemption claims but likely to prevail on its claim that the ordinance impermissibly operates outside "the geographic borders of the City." Applying the severability doctrine, the district court upheld the ordinance and issued a temporary injunction that enjoined the city from enforcing the ordinance "against any employer resident outside the geographic boundaries of the City" until after adjudication of the case on its merits.
Both parties appealed. This court affirmed the district court's preliminary rulings as within its discretion. Minn. Chamber of Commerce v. City of Minneapolis , No. A17-0131, 2017 WL 4105201, at *2-4, *6 (Minn. App. Sept. 18, 2017), review denied (Minn. Nov. 28, 2017). We upheld the district court's reliance on the extraterritoriality doctrine to temporarily enjoin the city from enforcing the ordinance as to employers that resided outside of the city. Id . at *5.
In 2018, the city amended the ordinance to address the district court's concerns about its geographic reach. As amended, the ordinance provides that sick-and-safe leave only accrues for hours an employee works "within the geographic boundaries of the City." MCO 40.210(a) (2018). And sick-and-safe leave may only be used "when the employee is scheduled to perform work within the geographic boundaries of the City." MCO 40.220(k) (2018).
Both parties moved for summary judgment. The district court again rejected the chamber's argument that state law conflicts with or impliedly preempts the ordinance. But the court granted the chamber's motion as to the ordinance's extraterritorial operation, subject to the severability doctrine. The district court "enjoined [the city] from enforcing the Ordinance against any employer resident outside the geographic boundaries of the City of Minneapolis." The city appealed, and the chamber filed a cross-appeal.
ISSUES
I. Does state law preempt the ordinance?
*762 II. Does the ordinance violate the extraterritoriality doctrine because it applies to employers that are located outside of the city?
ANALYSIS
I. State law does not preempt the ordinance.
The City of Minneapolis is a home-rule charter city. Accordingly, in municipal matters, the city has "all the legislative power possessed by the legislature of the state, save as such power is expressly or impliedly withheld." Bolen v. Glass , 755 N.W.2d 1, 4-5 (Minn. 2008) (quotation omitted). Among these broad powers is the power to enact ordinances "to promote the health, safety, and welfare of residents." Builders Ass'n of Minn. v. City of St. Paul , 819 N.W.2d 172, 180 (Minn. App. 2012).
A state statute may preempt a municipal ordinance (1) expressly, (2) by "[implied] preemption, when a city ordinance attempts to regulate conduct in a field that the state legislature intended the state law to exclusively occupy," or (3) because the two conflict. State v. Kuhlman , 722 N.W.2d 1, 4 (Minn. App. 2006), aff'd , 729 N.W.2d 577 (Minn. 2007). Whether state law preempts a municipal ordinance is a legal question that we review de novo. Bicking v. City of Minneapolis , 891 N.W.2d 304, 312 (Minn. 2017).
No state statute expressly preempts the ordinance. But the chamber argues that the ordinance is void under the theories of conflict preemption and implied preemption. We address each argument in turn.
A. The ordinance does not conflict with state law.
Although numerous Minnesota statutes touch on the topic of employee leave, the chamber points to just one to support its conflict argument. Minn. Stat. § 181.9413 (sick-leave statute) addresses in general terms an employee's entitlement to sick leave, requiring employers to permit employees to use their sick-leave benefits to care for relatives who are ill or injured, and to use such benefits for "safety leave," even if the employer's policy does not permit such use. Minn. Stat. § 181.9413(b). Notably, the sick-leave statute does not mandate that sick leave be provided, much less require a certain number of leave days or that any part of the leave be paid. And it "does not prevent an employer from providing greater sick leave benefits than are provided for under this section." Id . (g). The chamber contends that the ordinance conflicts with the sick-leave statute because the statute "expressly permits employers of any size not to provide sick and safe leave." We are not persuaded.
In Mangold Midwest Co. v. Village of Richfield , our supreme court articulated four "general principles" that govern our conflict analysis. 274 Minn. 347, 143 N.W.2d 813, 816-17 (1966) ; see Bicking , 891 N.W.2d at 313 (accord). First, conflict generally exists "only when both the ordinance and the statute contain express or implied terms that are irreconcilable with each other." Mangold , 143 N.W.2d at 816. Under the second and third conflict principles, a "conflict exists where the ordinance permits what the statute forbids," and "[c]onversely, a conflict exists where the ordinance forbids what the statute expressly permits." Id . (emphasis omitted). Finally, "no conflict exists where the ordinance, though different, is merely additional and complementary to or in aid and furtherance of the statute." Id. at 817. The Mangold court applied the second conflict principle, concluding that a municipal ordinance that prohibited most businesses from selling groceries on Sundays *763 did not conflict with a state statute that prohibited all Sunday grocery sales because "the ordinance does not permit, authorize, or encourage violation of the statute." Id . at 819.
This court recently applied the Mangold conflict principles in a case that challenged the city's minimum-wage ordinance. Graco, Inc. v. City of Minneapolis , 925 N.W.2d 262, 267-71 (Minn. App. 2019), pet. for review filed (Minn. Mar. 22, 2019).[2] We first considered how the minimum-wage statute operates to determine whether it is prohibitive or permissive. Because the minimum-wage statute bars employers from paying less than the legislatively set minimum wage, we concluded it is prohibitive, and then considered whether the ordinance expressly permitted employers to pay lower wages. Id . at 267-68.
We conclude the second conflict principle governs our analysis of the sick-and-safe-leave ordinance. While the sick-leave statute is couched in terms of what an employee may do (use employer-provided personal sick leave to care for relatives and for safety reasons), it operates to prohibit employers from denying an employee's request to use leave under such circumstances. The ordinance requires all but the smallest employers to provide a minimum amount of paid sick-and-safe leave. The statute is silent as to whether such leave must be paid, or even provided to employees in the first place. Because the ordinance does not permit conduct that the sick-leave statute forbids, there is no conflict. Employers are able to comply with both the statute and the ordinance.
Relying on Bicking , the chamber argues that conflict exists because the ordinance "adds requirements for small employers that the Legislature has chosen not to impose." See 891 N.W.2d at 313. We addressed this same argument in Graco , and rejected it. Graco , 925 N.W.2d at 268-70. In Bicking , the supreme court held that a proposed Minneapolis charter amendment requiring police officers to obtain professional liability insurance conflicted with a statute requiring municipalities to defend and indemnify their officers and to provide the option to procure additional insurance. 891 N.W.2d at 315. We concluded in Graco that an ordinance is not "necessarily preempted if it includes additional requirements not present in state law." 925 N.W.2d at 269. Rather, a Bicking -type conflict occurs when an ordinance adds "requirements that would disrupt a uniform set of state regulations." Id. ; see Hannan v. City of Minneapolis , 623 N.W.2d 281, 284-85 (Minn. App. 2001) (upholding a city dog-bite ordinance that was more severe than a state dog-bite statute, stating, "as long as the state has not expressly precluded local regulation, there is no conflict when the state regulates a topic and the local government adds additional regulations that provide consequences greater than those already provided"); Canadian Connection v. New Prairie Township , 581 N.W.2d 391, 396 (Minn. App. 1998) (upholding a city setback ordinance as not in conflict with a statutory odor-management plan, although both applied to animal feedlots, because the two "address[ed] separate and distinct aspects of feedlot odor" and could be reconciled), review denied (Minn. Sept. 30, 1998). We are persuaded that the sick-and-safe-leave ordinance does not conflict with a legislative or regulatory scheme, and is not "in conflict merely because it imposes requirements *764 that are absent from the [sick-leave] statute." See Graco , 925 N.W.2d at 269-70.
In sum, the terms of the ordinance and the statute are not irreconciliable. Because the ordinance does not permit what the sick-leave statute prohibits, we conclude there is no conflict.
B. State law does not impliedly preempt the ordinance .
Implied preemption "is premised on the right of the state to so extensively and intensively occupy a particular field or subject with state laws that there is no reason for municipal regulation." Nordmarken v. City of Richfield , 641 N.W.2d 343, 348 (Minn. App. 2002), review denied (Minn. June 18, 2002). Minnesota courts apply a four-factor test first articulated in Mangold to determine whether implied preemption exists:
(1) What is the subject matter which is to be regulated? (2) Has the subject matter been so fully covered by state law as to have become solely a matter of state concern? (3) Has the legislature in partially regulating the subject matter indicated that it is a matter solely of state concern? (4) Is the subject matter itself of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state?
Jennissen v. City of Bloomington , 913 N.W.2d 456, 460 (Minn. 2018) (quotation omitted).
We begin by identifying the subject matter to be regulated. The chamber asserts that the subject matter should be broadly defined as "employer-provided leave," pointing to various statutes regarding employee leave. Examples of those statutes include Minn. Stat. §§ 181.92 (leave for adoptive parents), .941 (leave for pregnancy and parenting), .9413 (sick leave; care of relatives), .945, .9456, .9458 (leave for different types of organ and blood donation), .947-.948 (leave for military families) (2018). We are not persuaded.
It is undisputed that the city has the authority to regulate "public health, safety, and welfare." Builders Ass'n , 819 N.W.2d at 180. The city exercised this authority, enacting the ordinance to "safeguard the public welfare, health, safety and prosperity" of its people. MCO § 40.30(e). The statutes the chamber cites are narrow and discrete, addressing several types of employee leave. As the district court cogently observed, identifying the subject matter as private-employer-provided sick-and-safe leave is neither so broad as to encourage preemption, nor so selective as to inevitably preclude preemption. Compare State v. Gonzales , 483 N.W.2d 736, 738 (Minn. App. 1992) (stating that "[t]he subject matter involved cannot be defined so selectively that it is impossible for the state to fully regulate the field"), review denied (Minn. June 10, 1992), with Canadian Connection , 581 N.W.2d at 394 (defining the subject matter of a setback ordinance as regulation of odors, not regulation of pollution, which would be preempted by the state). We agree that the subject matter regulated by the ordinance is sick-and-safe leave provided by private employers.
We next consider the second and third Mangold implied-preemption factors-whether state law and regulations indicate the subject matter is of solely state concern. The chamber argues that the breadth of the above-referenced statutes, related regulations regarding calculating and tracking of certain benefits, and the absence of any state law requiring private employers to "provide, track, or pay for sick leave," supports implied preemption. These arguments are unavailing.
*765 Some of the referenced statutes prescribe the amount of leave employers must provide; others do not. Some of the statutes require employers to pay for leave; others do not. Some of the statutes implicate illness-related leave; others do not. We are not persuaded that these varied statutes coalesce into any comprehensive scheme or evince a legislative intent to fully cover or even partially regulate a matter solely of state concern.
Our supreme court's analysis in Jennissen is instructive. In that case, a group of residents petitioned the city to pass an ordinance requiring voter approval to implement organized waste collection. 913 N.W.2d at 458. The city argued that the proposal was preempted by a statute that includes detailed procedures for implementing the organized collection of waste. Id . at 459. The supreme court rejected this argument, reasoning that (1) although the statute establishes detailed procedures for organizing solid-waste collection, it does not prescribe how a city should decide whether to establish organized collection; (2) the statutory requirements establish minimum steps a municipality must take, not an exhaustive process; and (3) the statute allowed "municipalities ... considerable flexibility," by making organization of waste collection optional and "expressly leav[ing] room for any municipal action that is authorized under a city charter or other law relating to organized collection." Id . at 461-62.
The employee leave-related statutes at issue here are far less comprehensive than the statute at issue in Jennissen . They are limited and discrete. And none even purports to establish a detailed regulatory scheme. Accordingly, they provide a stronger basis than in Jennissen for concluding that "the Legislature has not so fully covered the subject matter" of private-employer-provided sick-and-safe leave as to show that "it is solely a matter of state concern." See id. at 462 (quotation omitted).[3]
As to the final Mangold factor, the chamber argues that the district court erred by considering the ordinance's impact "upon the rest of the state-employers and employees-who merely work a fraction of their time in Minneapolis." But this factor expressly requires consideration of "unreasonably adverse effects upon the general populace of the state ." Mangold , 143 N.W.2d at 820 (emphasis added).
In applying this factor in Jennissen , the supreme court simply stated that because the legislature allowed municipalities flexibility in organizing waste collection, "[i]t follows that local regulation would not have unreasonably adverse effects upon the general populace of the state." 913 N.W.2d at 462. Because the most apposite legislation-the sick-leave statute-is silent as to whether and to what extent private employers must provide sick-and-safe leave, we discern no unreasonable adverse effects on the state population occasioned by the ordinance. Indeed, it is likely many state residents would support efforts to keep employees who are ill out of Minneapolis workplaces or allow them to care for family members in need.
The chamber's expressed concern about the adverse impact of a "patchwork" of municipal sick-and-safe-leave ordinances is speculative, at best. See *766 Bd. of Supers. v.ValAdCo , 504 N.W.2d 267, 271 (Minn. App. 1993) (observing that "[i]f every township were allowed to set its own pollution control conditions, the result could be a patchwork of different rules"), review denied (Minn. Sept. 30, 1993). As evidence of this purported adverse effect, the chamber cites excerpts from deposition and affidavit testimony of three employers, all of whom oppose the ordinance due to administrative burdens. The views of three employers do not necessarily represent the views of the general populace of this state. Moreover, the city cites contrary testimony from employers who favor the ordinance. The chamber has not shown that the city's regulation of sick-and-safe leave available to employees working in the city will have unreasonably adverse effects upon the general populace of Minnesota.
Application of the four implied-preemption factors demonstrates that the legislature did not intend to exclusively control the field of private-employer-provided sick-and-safe leave. State law does not impliedly preempt the ordinance.
II. The ordinance does not have impermissible extraterritorial effect.
The 2018 amendments to the ordinance clarify that sick-and-safe leave accrues only when an employee performs work "within the geographic boundaries of the City," MCO § 40.210(a), and is mandated only for days the employee is scheduled to work in the city, MCO § 40.220(k). With these amendments, the city argues that the ordinance does not operate extraterritorially and that the district court erred by ruling that it did and by enjoining the city from enforcing the ordinance "against any employers resident outside the geographic boundaries of the City of Minneapolis." We review this legal issue de novo. See Melrose Gates, LLC v. Moua , 875 N.W.2d 814, 819 (Minn. 2016) (reviewing summary judgment de novo when material facts are undisputed).
Under the extraterritoriality doctrine, "the power and jurisdiction of the city are confined to its own limits and to its own internal concerns." City of Duluth v. Orr , 115 Minn. 267, 132 N.W. 265, 265 (1911) ; cf. Healy v. Beer Inst. , 491 U.S. 324, 337, 109 S.Ct. 2491, 2500, 105 L.Ed.2d 275 (1989) (defining federal extraterritoriality doctrine as precluding application of a state statute that controls "commercial activity occurring wholly outside the boundary of the State"). Typically, "[t]he extraterritoriality doctrine applies only when its narrow parameters are met; when a law ... controls commerce totally outside its borders." In re Application of Griepentrog , 888 N.W.2d 478, 495 (Minn. App. 2016). The doctrine is not the subject of frequent litigation; courts invoke it sparingly in deference to a municipality's broad right to self-regulate. See White Bear Docking & Storage, Inc. v. City of White Bear Lake , 324 N.W.2d 174, 175 (Minn. 1982) (addressing judicial review of municipal decisions generally).
The parties rely on three Minnesota cases involving the claimed extraterritorial operation of city ordinances. In the seminal case of State v. Nelson , the supreme court upheld a Minneapolis ordinance that required all persons seeking a license to sell milk in the city to allow city staff to inspect their dairy and herd, most of which were located in dairies outside of the city. 66 Minn. 166, 68 N.W. 1066, 1067-68 (1896). Nelson, who sold milk in the city without a license, challenged the ordinance as having impermissible extraterritorial effect. Id . The supreme court first noted the validity of local regulations designed to prevent the sale of unwholesome milk in the city. Id. at 1068. And the court observed that if such regulations "did not provide means for insuring the wholesomeness *767 of milk ... brought into the city for sale and consumption," the regulations "would furnish very inadequate protection to the lives and health of the citizens." Id . Because the ordinance provided for inspections of dairies and herds located outside the city only if the owner wanted to sell milk in the city, the court concluded that the ordinance's provisions "go only so far as it is reasonably necessary to prevent the milk of diseased cows being sold within the city." Id . The court held that the ordinance had no "extraterritorial operation" because "[t]he only subject upon which it operates is the sale of milk within the city." Id .
Fifteen years later in Orr , the supreme court invalidated a Duluth ordinance to the extent of its extraterritorial operation. The ordinance prohibited the storage of explosives inside the city and within a mile of the city limits. 132 N.W. at 265. The Orr court struck down the ordinance with respect to territory beyond the city limits, reasoning that "the power and jurisdiction of the city are confined to its own limits" and that permitting the city to exercise power outside of its territory would create "[i]nnumerable conflicts" even though the control exercised by the city would be "convenient and gratifying to the people within the city." Id . at 265-66.
More recently, this court considered whether a Plymouth ordinance, which made it unlawful to mail or deliver harassing letters to city residents, impermissibly operated outside of the city limits. City of Plymouth v. Simonson , 404 N.W.2d 907, 908 (Minn. App. 1987), review denied (Minn. June 26, 1987). Simonson mailed two letters from Minneapolis to a Plymouth resident who received them in Plymouth. Id . Simonson argued that the Plymouth ordinance had extraterritorial effect because it regulated his conduct in Minneapolis. Id . Relying on Nelson , we rejected Simonson's argument because the ordinance "merely restricts the delivery of harassing mail to people in Plymouth." Id . (emphasis added). The ordinance did not purport to address or control Simonson's act of mailing the letters outside of the city. Id .
The city argues that Nelson defeats the chamber's extraterritoriality argument and the district court erred by focusing on whether the 80-hour threshold for applying the ordinance to non-city employers is an effective way to protect public health and welfare. These arguments have merit.
Nelson instructs us to first consider the purpose behind the ordinance. It is undisputed that the city has a valid interest in promoting the health and well-being of its people. This interest is implicated when an employee shows up sick for work in the city. Requiring employers to provide sick-and-safe leave to workers they place in the city furthers this interest. As in Nelson , we are persuaded that restricting the ordinance's application to employees who work for Minneapolis-based employers would undermine the goal of protecting public health. Because leave accrues under the ordinance only while an employee works in the city, and an employer must permit use of accrued benefits only on scheduled work days in the city, the ordinance has no impermissible extraterritorial operation. In Nelson , the supreme court concluded that the milk ordinance had "no extraterritorial operation," even though it required inspections and record-keeping outside the city, because "[t]he only subject upon which it operates is the sale of milk within the city." 68 N.W. at 1068. Indeed, the impact on non-city employers here is much less significant than it was in Nelson , where entire herds of cows and dairy operations located outside of the city were subject to inspection and record-keeping requirements if the owners *768 desired to sell any amount of milk in Minneapolis.[4] We are not persuaded that requiring employers to track the hours its employees work in Minneapolis significantly increases its record-keeping burden.
Nelson also guides our consideration of the 80-hour threshold-the provision that the ordinance only applies to employers that place a worker in the city 80 or more hours in a year. The chamber seizes on one sentence from Nelson -where the supreme court stated that the dairy inspection ordinance goes "only so far as it is reasonably necessary to prevent the milk of diseased cows being sold within the city." Id. According to the chamber, this sentence mandates consideration of whether the 80-hour threshold serves the stated purpose of and the public policy underlying enactment of the ordinance. We disagree. When read in context, this sentence merely amplifies the Nelson court's determination that the dairies and herds outside the city that were subject to inspection were appropriately limited to those whose milk would be sold in the city. Nothing in Nelson or its progeny suggests that a court may, under the guise of determining whether an ordinance operates outside the city's territory, examine a municipality's legislative policy determination supporting its enactment of an ordinance.[5]
Moreover, we are not convinced that the 80-hour threshold is relevant to the extraterritoriality issue. If the proposed sale of even one drop of milk in Minneapolis warranted city inspection of dairies located anywhere in Minnesota, we are hard pressed to discern how the 80-hour threshold-which reduces the ordinance's operation-defeats the ordinance. In our estimation, the determinative factors are the circumstances under which an employee accrues and may use her sick-and-safe leave. Because the ordinance permits leave to accrue only when an employee works in the city and permits an employee to use her leave when scheduled to work in the city, the ordinance operates solely within the city.
DECISION
The ordinance does not conflict with the sick-leave statute, other Minnesota statutes do not impliedly preempt the ordinance, and the ordinance does not operate extraterritorially. We therefore affirm the district court's grant of summary judgment to the city on preemption, and reverse the district court's ruling as to the ordinance's extraterritorial effect and the order enjoining the city from applying the ordinance to employers located outside of Minneapolis.
Affirmed in part and reversed in part.
Concurring specially, Connolly, Judge
CONNOLLY, Judge (concurring specially)
I concur with the majority's opinion that the Minneapolis sick-and-safe-leave ordinance is not preempted by state law and has no extraterritorial effect. I write separately *769 because I share the district court's concern that the ordinance's 80-hour threshold is not reasonably related to its purpose and the ordinance appears to be unduly burdensome on employers.
First, there is no indication that the ordinance's 80-hour threshold is reasonably related to its intended benefit. As the district court noted, an employee would have to work at least 240 hours, or six weeks full-time, per year in Minneapolis to accrue just one day of sick-and-safe leave. An employee who works in Minneapolis the threshold two weeks per year would receive less than three hours of sick-and-safe leave. There is no evidence that the limited sick-and-safe leave an employee would receive for working those two weeks is enough to prevent an employee from working in Minneapolis while sick. And there is no requirement that the employee use their accrued sick-and-safe leave when they are sick.
The city offered no explanation for how this threshold is related to its purpose "to safeguard the public welfare, health, safety and prosperity of the people" of the city. Minneapolis, Minn., Code of Ordinances (MCO) § 40.30(e) (2018). At his deposition, the city clerk was specifically asked: "[W]hy the Workplace Partnership Group decided to set the triggering threshold, if you will, at an employee working 80 hours annually within the geographic boundaries of the city of Minneapolis?" He responded: "I can't speak to why that was the final number." It appears the Workplace Partnership Group, the advisory body appointed to lead and develop recommendations that were considered for part of the ordinance, simply looked to other city ordinances and chose to draft the low threshold of 80 hours to obtain a broad impact.[6] The commissioner of the city's health department considered general research about the impact of sick-leave benefits, but did not present any research that supports the decision to make the ordinance apply to all employers, whose employees work as little as 80 hours within the city per year, regardless of where they are located. Although there is evidence of the positive health impacts of paid sick-and-safe leave, there is no record evidence of how this particular threshold achieves the purpose of the ordinance.
I agree that the geographic reach of the ordinance is the primary consideration in an extraterritoriality claim, but the language used in Nelson and Simonson suggests that whether the ordinance is crafted to achieve its purpose should also be considered in determining its validity. See State v. Nelson , 66 Minn. 166, 68 N.W. 1066, 1068 (1896) ("The provisions of the ordinance ... go only so far as it is reasonably necessary to prevent the milk of diseased cows being sold within the city."); City of Plymouth v. Simonson , 404 N.W.2d 907, 908 (Minn. App. 1987) ("If Plymouth could not restrict the flow of damaging mail into the city, the purpose of the ordinance would be frustrated."), review denied (Minn. June 26, 1987). In Nelson , the only way to ensure that milk sold within the city was pure was to inspect the dairies and dairy herds, rather than the milk. See Nelson , 68 N.W. at 1068 ("To determine whether it does or does not contain the germs of any contagious or infectious disease it is necessary to inspect the animals which produce it."). Restricting the flow of any contaminated milk into the city is reasonably related to the goal of preventing "the sale of unwholesome milk within the city." Id. But here there is no *770 evidence in the record that providing only three hours of sick leave in a 52-week work year is reasonably related to the goal of keeping sick people who occasionally work in Minneapolis from infecting well people who work, live, or otherwise find themselves in Minneapolis.
Next, I believe that the ordinance will burden employers located outside of Minneapolis and may not provide any material benefit. The city contends that "any burden to an employer is minimal." But amicus curiae Minnesota Management Attorneys Association explores the administrative burdens faced by employers to comply with the ordinance's "tracking, recordkeeping, and posting requirements," and labels them "a compliance nightmare for employers who are not located in the [c]ity." The ordinance requires employers to track the amount of time each employee works in the city. MCO § 40.210 (2018). Minnesota Management Attorneys Association points out that the ordinance also imposes numerous other burdens on employers:
An employer must ensure that an employee can (1) earn one hour for every 30 hours worked in the [c]ity; (2) accrue up to 48 hours of leave per year; (3) carry over up to 80 hours of accrued, but unused, leave from one year to another; and (4) maintain their leave balance for 90 days after separation or up to three years in the event of transfer. [MCO § 40.210] An employer must also allow an employee to utilize the leave (1) without providing more than seven days' notice when the need for leave is foreseeable, and only as soon as practicable when the need is not foreseeable; (2) without providing supporting documentation unless an employee is absent for more than three consecutive days; and (3) without suffering any discrimination or adverse employment action, including disciplinary action. Id. , §§ 40.220, 40.240. And if the employer has six or more employees, the employer must pay an employee for leave at the same rate as the employee would have been paid for the hours scheduled. Id. , § 40.220.
... An employer must publish a notice informing employees of their rights under the [o]rdinance and include a notice of rights and remedies in any handbook provided to employees. Id. , § 40.250. An employer must also maintain accurate records showing the number of hours of leave available and used for each employee for a period of not less than three years, in addition to the current calendar year. Id. , § 40.270.
In conclusion, I have serious concerns that the ordinance's 80-hour threshold is not reasonably related to its purported purpose and I do believe the ordinance is burdensome on employers located outside of Minneapolis. Nevertheless, I do agree with the majority's conclusion that the ordinance is not preempted by state statute and that the focus of the extraterritorial analysis is on the geographic reach of the ordinance. Consequently, I would uphold the ordinance despite my reservations.

Local (except for Minneapolis), state, and federal government employers are excluded from the definition of employers. MCO § 40.40.

We note that Graco also argued that the minimum-wage ordinance had improper extraterritorial reach. The district court rejected that argument, and Graco did not challenge that ruling on appeal.

For the same reason, we reject the chamber's attempt to distinguish Jennissen on the ground that the statute at issue there did not merely leave room for municipal action but actually invited it. As in Jennissen , no unifying statutory scheme or single statute speaks to the topic of private-employer-provided sick-and-safe leave.

The chamber also urges that this case is analogous to Orr because the ordinance extends beyond the city limits of Minneapolis to "non-resident employers whose employees perform only intermittent work within the city." We disagree. The problem in Orr was that the ordinance prohibited storage of materials that were never inside the city limits. Orr , 132 N.W.2d at 265-66. Those facts are not present here.

The city challenges the district court's conclusions that the ordinance's 80-hour threshold is improper and the ordinance is not "narrowly crafted" as addressing an "unpled substantive due-process claim." The chamber did not raise a substantive due-process claim in district court, and we decline to address one in the first instance on appeal.

Other cities seem to set the threshold at 240 hours. See , e.g. , Seattle, Wash., Municipal Code § 14.16.015(B) (2019); Seattle Human Rights Rules ch. 70-040 (2018) (Seattle ordinance and regulations requiring 240 hours worked within the city).